**Bawol CABIRI, Plaintiff,**

v.

**Baffour ASSASIE-GYIMAH, Defendant.**

**93 CIV. 3566 (AGS).**

United States District Court,
S.D. New York.

April 18, 1996.

---

Scott Kamber, Sonnenschein Nath & Rosenthal, New York City, for Plaintiff.

S. Reid Kahn, Kane Kessler, P.C., New York City, for Defendant.

## OPINION & ORDER

SCHWARTZ, District Judge:

This matter is before the Court on defendant Baffour Assasie–Gyimah's motion to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(5) and 12(b)(6). For the reasons set forth below, defendant's motion is denied.

## BACKGROUND

Plaintiff Bawol Cabiri brings this action under the Torture Victim Protection Act of 1991, Pub.L. No. 102–256, 106 Stat. 73, and the Alien Tort Claims Act, 28 U.S.C. § 1350.[1] Cabiri is an alien from the Republic of Ghana who resides in the State of New York, having been granted political asylum by the United States in 1993. Defendant, a citizen and resident of Ghana, is a Commander in the Ghanaian Navy and the Deputy Chief of National Security.

This action arises from events which allegedly took place from July 1986 until June 1991 in the Republic of Ghana. For purposes of ruling on defendant's motion to dismiss the action, the Court construes in plaintiff's favor any well-pleaded factual allegations in the Complaint. *See Allen v.*

1. The Alien Tort Claims Act provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed

*WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991).

Prior to July 1986, Cabiri served as Trade Counsellor for the Republic of Ghana in New York, where he and his family lived in a residence owned by the Ghanaian government, located in Westbury, New York. In July 1986, Cabiri was recalled to Ghana for a "consultation" at the Ministry of Trade. The Ghanaian government suspected plaintiff of being involved in the planning of a coup to overthrow the government. *See* Affidavit of Baffour Assasie–Gyimah in Support of Defendant's Motion to Dismiss, dated May 27, 1994 ("Assasie–Gyimah Aff."), at ¶ 7. On the instructions of defendant, in his capacity as Deputy Head of National Security, Cabiri was arrested and investigated for treason and subversion. *Id.* at ¶ 8. Cabiri alleges that he was imprisoned for nearly one year at a camp run by the Bureau of National Investigation ("BNI") without cause and without charge. *See* Compl. at ¶ 9. During his detention, Cabiri claims that defendant subjected him to ongoing physical and mental abuse, in violation of his basic human rights, and denied him all contact with his family in the United States. In particular, plaintiff alleges that under the direction of Assasie–Gyimah, BNI security officers beat him and administered electric shocks to his body, particularly to his genitals, sometimes as often as three times a night. *Id.* at ¶ 15. In addition, plaintiff alleges that defendant personally interrogated him on at least two occasions, during which Cabiri was beaten and his life threatened when his answers were not satisfactory. *Id.* at ¶ 16. Cabiri claims that he was released on June 3, 1987, without having been charged with any wrongdoing, and that he was subjected to internal exile in Ghana until June 1991, when he was allowed to return to the United States.

In March 1987, while Cabiri was imprisoned in Ghana, the Ghanaian government retired Cabiri from the Civil Service, with retroactive effect from October 31, 1986, "for assisting subversive elements based in the USA in their attempts to destabilize the gov-

in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

ernment whilst an officer of the Ghana Mission of New York." Assasie–Gyimah Aff. at ¶ 12 (quoting Notice of Retirement, Ex. B). Following Cabiri's termination, his wife, Efua Cabiri, refused to vacate the house in Westbury, New York owned by the Ghanaian government.

In October 1987, Ghana filed a petition to recover the residence in the Nassau County District Court, captioned *Government of the Republic of Ghana v. Bawol Cabiri, Efua Cabiri, and All Other Persons Occupying the Premises at 34 Marietta Drive, Westbury, New York 11590*, Index No. SP 4353/87 (the "State Action"). In response to Ghana's petition for possession, Mrs. Cabiri served an answer which included counterclaims for breach of contract, intentional infliction of emotional distress and *prima facie* tort. In addition, Mrs. Cabiri moved the court for an order directing Ghana to produce plaintiff so that he could testify in the State Action. Ghana cross-moved for summary judgment and for dismissal of Mrs. Cabiri's affirmative defenses and counterclaims. The Nassau County District Court granted Ghana's cross-motion and denied Mrs. Cabiri's motion.

However, the Appellate Term of the Supreme Court of the State of New York reversed the judgment of the Nassau County District Court, denying Ghana's cross-motion and reinstating Mrs. Cabiri's defenses and counterclaims. In so doing, the court held that a triable issue of fact had been raised as to the conditions of plaintiff's employment as Trade Counsellor. The Appellate Term further held that Mrs. Cabiri's counterclaims were permissible under the Foreign Sovereign Immunities Act. *See* Affidavit of Scott A. Kamber, Esq. in Opposition to Defendant's Motion to Dismiss, dated July 6, 1994 ("Kamber Aff."), at ¶ 8. In light of the decision of the Appellate Term, Mrs. Cabiri moved the Nassau County District Court for an order to stay the proceedings until Ghana released plaintiff and allowed him to return to the United States. The court granted the motion.

In November 1993, more than two years after Cabiri's return to the United States, Ghana moved to enforce a settlement agreement which was allegedly reached while plaintiff was being held in Ghana. Plaintiff cross-moved for discovery with respect to the issues raised by the Government's petition and the Cabiris' answers and counterclaims. In December 1993, plaintiff also filed his verified answer and counterclaims for breach of contract, abuse of trust, fraudulent misrepresentation, false imprisonment and intentional infliction of emotional distress. In February 1994, the court denied Ghana's motion to enforce the settlement agreement and granted plaintiff's motion for discovery. In addition, the court denied a motion made by Ghana to strike Cabiri's answer as untimely and to sever or dismiss his counterclaims pursuant to the Foreign Sovereign Immunities Act and Act of State Doctrine. Ghana has moved that this decision be reconsidered by the Nassau County District Court.

Pursuant to the court's discovery order, Cabiri served Ghana with a request for documents and a notice of depositions. Cabiri's notice of depositions demanded that Ghana produce for oral examination 21 officials and officers of the Ghanaian government, most of whom reside in Ghana. Ghana requested a conference with the court, at which it agreed to produce three witnesses of its own choosing. One of those witnesses was Assasie–Gyimah. The parties also agreed that a conference would be held on May 13, 1994, "at which representatives of the respective parties will appear with authorization to enter into a settlement agreement with respect to the matter." Affidavit of S. Reid Kahn, Esq. in Support of Defendant's Motion to Dismiss, dated June 20, 1994 ("Kahn Aff."), at ¶ 17 and Ex. F thereto (Ordered Stipulation dated April 25, 1994).

Defendant arrived in the United States on or about May 3, 1994. On May 6, 1994, the oral examinations commenced at the offices of plaintiff's counsel. Depositions of Ghana's witnesses were conducted from May 6 to May 13, 1994; the defendant attended each day of depositions and testified on May 10 through May 12, 1994. At his deposition, Assasie–Gyimah testified that he had ordered the police to arrest Cabiri at the Ministry of Trade in Ghana and that he was "solely in charge of the investigation," which he "conducted and supervised." Kamber Aff., Ex.

F. at 142, 255, 356. Having heard this testimony, as well as the allegations of torture made by his client, Cabiri's counsel determined that a cause of action lied against Assasie–Gyimah under the Torture Victim Protection Act of 1991. *See* Kamber Aff. at ¶ 21.

On May 16, 1994, a conference was held in the State Action, which was attended by the parties to that action, their counsel, and the three Ghanaian witnesses. Following the conference, the parties and counsel engaged in settlement negotiations outside the courthouse. When the discussion ended, no settlement having been reached, plaintiff's counsel served defendant with a summons and complaint in the instant action.

## DISCUSSION

Defendant moves to dismiss the Complaint on the grounds that (1) the Court lacks personal jurisdiction over defendant, (2) the action is barred by the applicable statutes of limitations, (3) plaintiff's claims are barred by the Foreign Sovereign Immunities Act, and (4) under the doctrine of *forum non conveniens*, the action should have been brought in Ghana.

### 1. *Personal Jurisdiction*

■ Defendant moves to dismiss the Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(5), on the ground that the Court lacks jurisdiction over his person. Assasie–Gyimah argues that he was immune from service of process at the time plaintiff's counsel handed him the summons and complaint in this action because he was in the United States for the sole purpose of facilitating the proceedings in the State Action.

■ It is well established that witnesses, parties and attorneys coming from another jurisdiction are exempt from service of civil process while in attendance upon court, and during a reasonable time in coming and going. *Stewart v. Ramsay*, 242 U.S. 128, 129, 37 S.Ct. 44, 45, 61 L.Ed. 192 (1916). In *Lamb v. Schmitt*, 285 U.S. 222, 52 S.Ct. 317, 76 L.Ed. 720 (1932), the Supreme Court explained that

[t]he general rule that witnesses, suitors, and their attorneys, while in attendance in connection with the conduct of one suit, are immune from service of process in another, is founded, not upon the convenience of the individuals, but of the court itself. As commonly stated and applied, it proceeds upon the ground that the due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits, which would prevent, or the fear of which might tend to discourage, the voluntary attendance of those whose presence is necessary or convenient to the judicial administration in the pending litigation.

*Id.*, 285 U.S. at 225, 52 S.Ct. at 318 (citations omitted).

The court in *Lamb*, however, carved out an exception to this general rule, holding that the above considerations are outweighed where "the immunity itself, if allowed, would so obstruct judicial administration in the very cause for the protection of which it is invoked as to justify withholding it." *Id.*, 285 U.S. at 228, 52 S.Ct. at 319. The court found that the defendant in *Lamb* was not immune from service of process, reasoning, *inter alia*, that the two suits were "not independent of each other or unrelated," that the "second was brought in aid of the first," and that the second suit was brought "to secure rights asserted in the first suit which, but for the acts charged against the petitioner in the second, would have been secured in the first." *Lamb*, 285 U.S. at 227, 52 S.Ct. at 318–19.

The application of this exception appears to be rare but not unknown. The Second Circuit has held that the "mere presence of [a] relationship [between the two actions] is insufficient to dispel the immunity" from service of process in the second action. *Shapiro & Son Curtain Corp. v. Glass*, 348 F.2d 460, 461 (2d Cir.1965), *cert. denied*, 382 U.S. 942, 86 S.Ct. 397, 15 L.Ed.2d 351 (1965). However, where there is a "closer relationship" between two actions, and the "two proceedings involve vindication of the same cluster of rights and interests," the Second Circuit has affirmed the withholding of immunity.

*McDonnell v. American Leduc Petroleums, Ltd.*, 456 F.2d 1170, 1179–80 (2d Cir.1972). In *McDonnell*, the Second Circuit agreed with the district court's reasoning that, "where you have two proceedings that are as closely related as this, both of them seeking substantially the same objectives . . . the reason for the immunity has been swept away and . . . this man cannot complain because the very subject matter for his appearance in the first instance is the subject matter for the lawsuit which is being brought against him." *Id.*, 456 F.2d at 1180.

In February 1994, Cabiri requested the production of all documents relating to his recall to Ghana, his detention there and his release; and he noticed the depositions of 21 Ghanaian officials who may have had such documents in their possession, custody, or control. *See* Kahn Aff., Ex. E. In response, Assasie–Gyimah and two other witnesses were produced by the government of Ghana to be deposed. Clearly, the purpose of Cabiri's document request and notice to take depositions in the State Action was to gather evidence to support his counterclaims. At his deposition, Assasie–Gyimah was asked, and he answered, questions relating to Cabiri's recall to Ghana, his arrest, imprisonment and release, events which are the subject of the instant action. In other words, "the very subject matter for [Assasie–Gyimah's] appearance in the [State Action] is the subject matter for the lawsuit which is being brought against him" now, and the "two proceedings involve vindication of the same cluster of rights and interests." *McDonnell*, 456 F.2d at 1180.

Defendant argues that *McDonnell* is distinguishable on its facts. In that case, the defendant was served with a subpoena duces tecum requiring his appearance in connection with a pending Section 167 bankruptcy proceeding. The defendant appeared and was requested to return several days later. Upon leaving the courthouse after his second appearance, he was served with a supplemental summons and the first amended complaint relating to a fraudulent conveyance action brought by the bankruptcy trustee in the Section 167 proceeding. The court found it significant that "the very purpose of a section 167 investigation is to uncover for the trustee conducting it possible causes of action, including actions against those called to testify," and that the Section 167 proceeding "was actually used as a discovery device for the present action." *McDonnell*, 456 F.2d at 1180.

Assasie–Gyimah argues that, in contrast, the landlord/tenant proceeding brought by the government of Ghana is not a "discovery device" for Cabiri's action against defendant, and the instant action does not "carr[y] out the purpose of the earlier . . . proceeding," as the court in *McDonnell* found. *See* 456 F.2d at 1180.

█ The Court rejects defendant's contention that the Second Circuit's holding in *McDonnell* is limited to the factual circumstances found in that case. Independent of the fact that the first action was a Section 167 bankruptcy proceeding, which was used as a discovery device for the second action, *McDonnell* stands for the proposition that where there is a close relationship between the two actions, and both involve vindication of the same cluster of rights and interests, then immunity from service of process should be withheld. The Court finds that these conditions are met in the instant action. Accordingly, defendant's motion to dismiss for lack of personal jurisdiction is denied.[2]

#### 2. *Statute of Limitations*

█ Defendant moves to dismiss the Complaint on the ground that it is barred by the applicable statutes of limitations. Plaintiff's claims are based on events which occurred up to seven years before this action was commenced. Defendant argues that jurisdiction is premised on the Alien Tort Claims Act, 28 U.S.C. § 1350, and at the time when plaintiff's cause of action accrued, Congress

---

2. Plaintiff also argues that Assasie–Gyimah remained in the jurisdiction longer than reasonably necessary for the purpose of being deposed in the State Action, thereby waiving immunity. Defendant states that he remained in New York until May 27, 1994 due to the necessity of responding to the Complaint in this action. Since the Court finds it unnecessary to reach the issue of waiver, it declines to do so.

had not provided a statute of limitations for claims brought pursuant to the Alien Tort Claims Act. Therefore, defendant submits, the statutes of limitations of the most analogous state law claims apply; and under these statutes of limitations, plaintiff's action must be dismissed.[3] Plaintiff responds that the ten year statute of limitations contained in the Torture Victim Protection Act of 1991 (the "Torture Act") applies retroactively to his claims, even though the events alleged in the Complaint took place prior to the enactment of the Torture Act.[4]

The Torture Act was promulgated to

carry out obligations of the United States under the United Nations Charter and other international agreements pertaining to the protection of human rights by establishing a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing.

Pub.L. No. 102–256, 106 Stat. 73. Section 2 of the Torture Act provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation—(1) subjects an individual to torture[5] shall, in a civil action, be liable for damages to that individual. . . ." *Id.*, § 2(a). The Torture Act establishes a ten year statute of limitations and is silent as to the question of retroactive application.

The Supreme Court's decision in *Landgraf v. USI Film Products,* 511 U.S. 1483, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), is instructive as to whether the Torture Act applies to a cause of action which accrued prior to its enactment. In *Landgraf,* the Court held that provisions of the Civil Rights Act of 1991 allowing recovery of compensatory and punitive damages, and authorizing a jury trial on such damages, did not apply to a case pending on appeal when the statute was enacted. Significantly, the Court emphasized the importance of a general presumption against the retroactivity of a statute:

the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.

*Landgraf,* 511 U.S. at ——, 114 S.Ct. at 1497 (internal quotations and citations omitted). The Court acknowledged, however, that,

Any test of retroactivity will leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have sound instincts, and familiar considerations of *fair notice, reasonable reliance, and settled expectations* offer sound guidance.

*Id.,* 511 U.S. at ——, 114 S.Ct. at 1499 (internal quotations and citations omitted) (emphasis supplied). In addition, the *Landgraf* Court stated:

We have regularly applied intervening statutes conferring or ousting jurisdiction,

---

3. Defendant states that Cabiri's cause of action is "a composite of claims for false imprisonment, assault, battery, and intentional infliction of emotional distress," and therefore the statutes of limitations applicable to these claims under New York law—ranging from one to three years—apply. Defendant's Mem. of L. at 15–16.

4. In the alternative, plaintiff argues that his claims are timely under New York law because, pursuant to C.P.L.R. § 207, New York statutes of limitations are tolled while a defendant is outside of the state when the cause of action accrues, and the tolling continues until the defendant returns to the jurisdiction. The Court finds it unnecessary to reach this argument.

5. Torture is defined as "any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." *Id.,* § 3(b)(1).

whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed.... Application of a new jurisdictional rule usually takes away no substantive right but simply changes the tribunal that is to hear the case. Present law normally governs in such situations because jurisdictional statutes speak to the power of the court rather than to the rights or obligations of the parties.

*Id.,* 511 U.S. at ——, 114 S.Ct. at 1501–02.

We find that, in applying the principles enunciated in *Landgraf,* the retroactive application of the Torture Act is entirely proper in this case. Even prior to the promulgation of the Torture Act, the defendant had fair notice that torture was not a lawful act. In *Filartiga v. Pena–Irala,* 630 F.2d 876 (2d Cir.1980), the Second Circuit held that the Alien Tort Claims Act provides federal jurisdiction for a claim against an alleged torturer, who is found and served with process by an alien within the borders of the United States. Twelve years before the enactment of the Torture Act, the *Filartiga* Court found that, "an act of torture committed by a state official against one held in detention violates established norms of the international law of human rights, and hence the law of nations," citing, *inter alia,* the United Nations Charter, the Universal Declaration of Human Rights, and the Declaration of the Protection of All Persons from Being Subjected to Torture. *Id.* at 880–82. This finding relied on the observation that,

> there are few, if any, issues in international law today on which opinion seems to be so united as the limitations on a state's power to torture persons held in custody.... [T]here is at present no dissent from the view that the guaranties [of the United Nations Charter] include, at a bare minimum, the right to be free from torture.

*Id.* at 881–82; *see also Kadic v. Karadzic,* 70 F.3d 232, 243 (2d Cir.1995) ("*official* torture is prohibited by universally accepted norms of international law, and the Torture Victim Act confirms this holding and extends it to cover summary execution"); *In re Estate of Ferdinand Marcos Human Rights Litigation,* 25 F.3d 1467, 1475 (9th Cir.1994), *cert.*

denied, *Estate of Marcos v. Hilao,* —— U.S. ——, 115 S.Ct. 934, 130 L.Ed.2d 879 (1995) (torture violates norms of *jus cogens* ).

One other district court has been faced with the question of whether the Torture Act applies retroactively. In *Xuncax v. Gramajo,* 886 F.Supp. 162 (D.Mass.1995), District Judge Woodlock held that the Torture Act applied retroactively to the claims of a United States citizen against Guatemala's former Minister of Defense, Hector Gramajo. The court found that,

> It cannot be suggested credibly that Gramajo "believed" his actions fell within some prevailing legal norm. Thus, the Supreme Court's observation in *Landgraf,* that "[i]n a free, dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions," is plainly inapplicable to the present case.

> For similar reasons, I find that the public's interest in seeing that the [Torture Act] is available to a plaintiff such as Ortiz who has suffered deliberately brutal abuse far outweighs any disappointment there might be of Gramajo's private expectations. There being thus neither compromise of substantive rights nor consequent manifest injustice, I conclude that retroactive application of the [Torture Act] as the law in effect at the time of decision is entirely proper in this case.

*Id.,* 886 F.Supp. at 177 (citations omitted). This Court agrees.

■ The alleged acts of Assasie–Gyimah, if presumed to be true, violated a fundamental principle of the law of nations: the human right to be free from torture. The defendant cannot complain that he had no notice that torture was not a lawful act. Moreover, any expectation he might have had that he would not be held accountable for the brutal acts alleged is rightly disrupted. Accordingly, the Court holds that the Torture Act, which provides a ten year statute of limitations, applies retroactively to plaintiff's claims.

Defendant's motion to dismiss the claims as time-barred, therefore, is denied.[6]

### 3. The Foreign Sovereign Immunities Act

■ Defendant moves to dismiss the Complaint on the ground that the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1330, 1602–11,[7] provides immunity from the jurisdiction of United States courts to foreign officials sued in their official capacity. Plaintiff responds that the FSIA is inapplicable to this case because it provides immunity only for acts carried out in the individual defendant's official capacity, and not for the commission of acts which exceed the lawful boundaries of a defendant's authority.

■ When a defendant is protected by the shield of immunity created by the FSIA, that Act provides the sole basis for obtaining jurisdiction over a foreign state and its agencies or instrumentalities. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 109 S.Ct. 683, 688, 102 L.Ed.2d 818 (1989). Thus, subject matter jurisdiction against a foreign state depends on the existence of one of the exceptions to immunity set forth in the FSIA. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493, 103 S.Ct. 1962, 1971, 76 L.Ed.2d 81 (1983).

■ It is well established that the FSIA provides immunity to individuals who are officials of a foreign government when they are sued in their official capacity. *See Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1103 (9th Cir.1990) ("We thus join the majority of courts which have similarly concluded that section 1603(b) can fairly be read

to include individuals sued in their official capacity"); *In re Estate of Ferdinand E. Marcos Human Rights Litigation*, 978 F.2d 493, 496 (9th Cir.1992), *cert. denied, Marcos–Manotoc v. Trajano*, 508 U.S. 972, 113 S.Ct. 2960, 125 L.Ed.2d 661 (1993) ("agency or instrumentality of a foreign state" includes individuals acting in their official capacity); *Bryks v. Canadian Broadcasting Corp.*, 906 F.Supp. 204, 210 (S.D.N.Y.1995) (FSIA immunity extends to agents of a foreign state acting in their official capacities); *Kline v. Kaneko*, 685 F.Supp. 386, 389 (S.D.N.Y.1988) (FSIA applies "to individual defendants when they are sued in their official capacity"); *Rios v. Marshall*, 530 F.Supp. 351, 371 (S.D.N.Y.1981) (official of foreign government instrumentality protected by FSIA); *American Bonded Warehouse Corp. v. Compagnie Nationale Air France*, 653 F.Supp. 861, 863 (N.D.Ill.1987) (defendants sued in their capacities as employees of state instrumentality are protected by FSIA).

■ However, the FSIA "will not shield an official who acts beyond the scope of his authority." *Chuidian*, 912 F.2d at 1106. In *In re Estate of Ferdinand Marcos Human Rights Litigation*, 978 F.2d 493 (9th Cir. 1992), defendant Imee Marcos–Manotoc, Ferdinand Marcos' daughter, who controlled the Philippine military police, claimed that regardless of whether she acted within the scope of her employment in committing the alleged acts of torture, she was entitled to absolute immunity under the FSIA. Marcos–Manotoc argued that a foreign state and its agents lose sovereign immunity only for

---

6. In his Reply Memorandum of Law, Assasie–Gyimah makes the additional argument that, if the Court applies the Torture Act retroactively to this action, plaintiff's claims are barred since he failed to exhaust the "adequate and available remedies in the place in which the conduct giving rise to the claim occurred," a requirement under the Torture Act. Pub.L. No. 102–56, § 2(b). However, the "legislative history to the [Torture Act] indicates that the exhaustion requirement of § 2(b) was not intended to create a prohibitively stringent condition precedent to recovery under the statute. Rather, the requirement must be read against the background of existing judicial doctrines under which exhaustion of remedies in a foreign forum is generally not required 'when foreign remedies are unobtainable, ineffective, inadequate, or obviously fu-

tile.'" *Xuncax v. Gramajo*, 886 F.Supp. at 178 (quoting S.Rep. No. 249, 102d Cong., 1st Sess. 10 (1991)). For the same reasons that the Court finds that Ghana provides an inadequate and unacceptable forum for plaintiff's claims, *see infra* at 1199, the Court finds that the exhaustion of remedies is not a requirement in this case.

7. The FSIA provides in relevant part:

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.
*28 U.S.C. § 1604.*

tortious acts occurring in the United States, relying, *inter alia*, on *Argentine Republic v. Amerada Hess Shipping Corp., supra.*[8] 978 F.2d at 497. However, the court found that, since Marcos–Manotoc admitted to having acted on her own authority, not on the authority of the Republic of the Philippines, "her acts cannot have been taken within any official mandate and therefore cannot have been acts of an agent or instrumentality of a foreign state within the meaning of the FSIA." Therefore, the FSIA was inapplicable to the action against her. 978 F.2d at 498; *see also In re Estate of Ferdinand Marcos Human Rights Litigation,* 25 F.3d at 1472 (FSIA does not apply to an action which is against an individual official accused of engaging in activities outside the scope of his authority); *Xuncax v. Gramajo,* 886 F.Supp. at 175 (FSIA immunity is "unavailable in suits against an official arising from acts that were beyond the scope of the official's authority"); *cf. Kadic v. Karadzic,* 70 F.3d at 250 (act of state doctrine is not implicated where the acts of a state official are taken in violation of a nation's fundamental law and wholly unratified by that nation's government).

Assasie–Gyimah does not claim that the acts of torture he is alleged to have committed fall within the scope of his authority. He does not argue that such acts are not prohibited by the laws of Ghana; nor could he. In *Filartiga, supra,* the Second Circuit observed that no government asserts a right to torture its citizens; rather, when confronted with reports of torture, a state "usually responds by denial or, less frequently, by asserting that the conduct was unauthorized or constituted rough treatment short of torture." *Id.,* 630 F.2d at 884 (quoting Memorandum of the United States as *Amicus Curiae* at 16, n. 34). In *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699 (9th Cir.1992), *cert. denied,* 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993), the Ninth Circuit similarly noted, "[t]hat states engage in official torture cannot be doubted, but all states believe it is wrong, all that engage in

torture deny it, and no state claims a sovereign right to torture its own citizens." *Id.* at 717.

The Court finds that the alleged acts of torture committed by Assasie–Gyimah fall beyond the scope of his authority as the Deputy Chief of National Security of Ghana. Therefore, he is not shielded from Cabiri's claims by the sovereign immunity provided in the FSIA. In short, the FSIA does not apply to this action. Furthermore, the Court has subject matter jurisdiction over this action pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350. *See Kadic v. Karadzic,* 70 F.3d at 246; *Filartiga v. Pena–Irala,* 630 F.2d at 887. Accordingly, defendant's motion to dismiss the Complaint on the ground that the FSIA provides him with a cloak of immunity from plaintiff's claims is denied.

### 4. *Forum Non Conveniens*

Defendant moves to dismiss the action pursuant to the doctrine of *forum non conveniens.* Defendant argues that the alleged events upon which plaintiff's Complaint is based occurred in Ghana, the relevant witnesses, other than plaintiff, are located in Ghana, and plaintiff may proceed with this action in the Ghanaian courts. Plaintiff responds that dismissing the Complaint on the ground of *forum non conveniens* would seriously undermine the purposes of the Torture Act. Moreover, plaintiff indicates that it would be unsafe for him to travel to Ghana to institute an action there, pointing to his political asylum status as proof that he has a "well-founded fear of persecution" in Ghana. Finally, plaintiff argues that the defendant is clearly able to travel to New York, as are other Ghanaian officials who may be called as witnesses, and any available documentary evidence, which is not likely to be voluminous, is in defendant's control.

The central purpose of a *forum non conveniens* inquiry is:

to determine where trial will be most convenient and will serve the ends of justice.

---

8. Assasie–Gyimah makes the same argument: "... the circumstances present herein—including the fact that all of the acts and occurrences of which Plaintiff complains occurred in Ghana—is

one such instance where the FSIA *is* inarguably an available defense." Defendant's Reply Mem. of L. at 24–25.

To prevail on a motion to dismiss based on *forum non conveniens,* a defendant must demonstrate that an adequate alternative forum exists and that, considering the relevant private and public interest factors set forth in *Gilbert,* the balance of convenience tilts strongly in favor of trial in the foreign forum.

*R. Maganlal & Co. v. M.G. Chemical Co., Inc.,* 942 F.2d 164, 167 (2d Cir.1991) (citations omitted). The private interests of the litigants to be weighed by the court include "the ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of the obtaining attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). Public interest factors to be considered include administrative difficulties stemming from court congestion; the interest in having "localized controversies decided at home"; and the interest in having issues of foreign law decided by a foreign tribunal. *Id.,* 330 U.S. at 508-09, 67 S.Ct. at 843; *see also R. Maganlal & Co. v. M.G. Chemical Co., Inc.,* 942 F.2d at 168. Finally, the "relative advantages and obstacles to fair trial" must be taken into account, and "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gilbert,* 330 U.S. at 508, 67 S.Ct. at 843.

In the instant action, the access to sources of proof and the availability of witnesses are, as plaintiff points out, in defendant's control. Since this action is brought pursuant to United States caselaw and statutes, namely the Alien Tort Claims Act and the Torture Act, this Court has an interest in having the issues of law presented decided by a United States court.

Moreover, the Court is unconvinced that the courts of Ghana provide an adequate alternative forum for this action. Presuming Cabiri's allegations to be true, he would be putting himself in grave danger were he to return to Ghana to prosecute this action. As the court in *Rasoulzadeh v. Associated Press,* 574 F.Supp. 854 (S.D.N.Y.1983), *aff'd,* 767 F.2d 908 (2d Cir.1985), stated:

> [i]f the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the district court may conclude that dismissal would not be in the interests of justice. A motion to relegate a plaintiff to a foreign forum will be denied if the plaintiff shows that foreign law is inadequate, or that conditions in the foreign forum plainly demonstrate that the plaintiffs are highly unlikely to obtain basic justice therein.

*Id.* at 861 (internal quotations and citations omitted). In that case, Judge Haight determined that the plaintiffs, citizens of Iran who had applied for political asylum in the United States, would be unable to obtain justice in the courts of Iran, and that if the plaintiffs were to return to Iran to prosecute their claims, as the defendant suggested, they would likely be killed. Under those circumstances, the court held that the defendant's motion to dismiss based upon *forum non conveniens* had "no substance." *Id.* Likewise in the instant action, the Court finds that plaintiff is highly unlikely to obtain justice in the Ghanaian courts, and that to force plaintiff to bring this action in Ghana would unnecessarily put him in harm's way, or, also unacceptable, would mean an end to the action altogether. Accordingly, defendant's motion to dismiss on the ground of *forum non conveniens* is denied.

### CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is denied. Counsel are directed to appear for a pre-trial conference at the United States Courthouse, Courtroom 14C, 500 Pearl Street, New York, New York on May 6, 1995 at 11:30 a.m. for purposes of scheduling further proceedings in this action.

SO ORDERED.