32 F.3d 697
 63 USLW 2184, Fed. Sec. L. Rep. P 98,361
 JACKSON NATIONAL LIFE INSURANCE COMPANY, Plaintiff-Appellant,
v.
MERRILL LYNCH & CO., INC., Merrill Lynch Pierce, Fenner &
Smith Incorporated, presently doing business as Merrill
Lynch & Company, formerly doing business as Merrill Lynch
Capital Markets, Defendants-Appellees.
 No. 1555, Docket 93-9287.
 United States Court of Appeals,
Second Circuit.
 Argued May 2, 1994.
Decided Aug. 12, 1994.
 
 Raymond A. Levites, New York City (Richard Cashman, Diane Britton, Pavelic & Levites P.C., of counsel), for plaintiff-appellant.
 Jack C. Auspitz, New York City (Debra Freeman, Claire Silberman, Morrison & Foerster, of counsel), for defendants-appellees.
 Before: PRATT and WALKER, Circuit Judges, and MOTLEY, District Judge.*
 WALKER, Circuit Judge:
 
 
 1
 Plaintiff Jackson National Life Insurance Company ("Jackson National") appeals from a judgment of the United States District Court for the Southern District of New York (John F. Keenan, Judge ), that dismissed, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Jackson National's claims under Secs. 11 and 12(2) of the Securities Act of 1933 (the " '33 Act"), 15 U.S.C. Secs. 77k, 77l (2), as barred by the statute of limitations, and its claim under Sec. 20A of the Securities Exchange Act of 1934 (the " '34 Act"), 15 U.S.C. Sec. 78t-1, for failure to plead a predicate violation of the '34 Act. For the reasons that follow, we affirm.
 
 BACKGROUND
 
 2
 We review de novo the district court's dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, taking as true the facts alleged in the complaint and drawing all reasonable inferences in the plaintiff's favor. Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991). Jackson National's claims arise out of what it contends was a fraudulently induced investment in Insilco Corporation ("Insilco"). The complaint alleges the following facts leading up to this suit.
 
 
 3
 Insilco is a publicly held corporation listed on the New York Stock Exchange. In August 1988 Insilco was purchased by a group of investors in a leveraged buyout (the "LBO") orchestrated by Merrill Lynch & Co., Inc. ("Merrill Lynch"). As a result of the LBO, Insilco took on a substantial amount of debt that included approximately $405 million in "bridge financing" provided by Merrill Lynch to ensure the deal's success. The terms of the bridge loan required Insilco to engage in a public offering of high-yield "junk" bonds and warrants as soon as was practicable, and to use the proceeds, among other purposes, to repay the bridge financing provided by Merrill Lynch.
 
 
 4
 In January 1989, Insilco undertook the public offering of additional debt securities and stock warrants with Merrill Lynch acting as its underwriter. The terms of the offering, including the proposed use of the proceeds to retire the bridge financing, were disclosed in a prospectus dated January 13, 1989, and a registration statement effective the same date. In response to solicitation by Merrill Lynch, Jackson National purchased nearly $8 million in principal amount of Insilco securities on January 23, 1989.
 
 
 5
 In May 1990, with the substantial debt burden from the LBO and public offering taking its toll, Insilco proposed a recapitalization to reduce its debt-to-equity ratio. Insilco promoted the recapitalization through a preliminary offering memorandum (the "Offering Memorandum") it filed with the Securities and Exchange Commission that disclosed updated information about the company's financial condition. The recapitalization plan ultimately failed, and in January 1991 Insilco filed for protection under the Bankruptcy Code.
 
 
 6
 Jackson National brought this suit claiming that Merrill Lynch participated in the distribution of securities through a materially misleading prospectus and registration statement. The complaint alleges three material misstatements or omissions: (1) the prospectus falsely indicated that the January 1989 offering was being conducted on an "all-or-none" basis when Merrill Lynch knew all the securities could not be sold to the public; (2) the prospectus failed to disclose that the "qualified independent underwriter," whose involvement was required by rules of the National Association of Securities Dealers, was not informed that the offering could not be conducted on an all-or-none basis because there was no public market for the entire offering; and (3) the prospectus failed to warn that the LBO had rendered Insilco insolvent before the offering took place.
 
 
 7
 The parties entered into a tolling agreement which deems all claims to have been filed as of June 28, 1991, the effective date of the agreement. Judge Keenan held that Jackson National's claims under Secs. 11 and 12(2) of the '33 Act were barred by the statute of limitations because even if the initial prospectus was misleading, the warnings in the prospectus and the subsequent Offering Memorandum put Jackson National on "inquiry notice" of the fraud more than one year before the tolling date. The court also held that Jackson National did not state a claim under Sec. 20A of the '34 Act because it did not plead a predicate violation of the '34 Act as Sec. 20A requires. On appeal, Jackson National challenges each of the district court's rulings.
 
 DISCUSSION
 I. The '33 Act Claims: Inquiry Notice
 
 8
 The statute of limitations applicable to Secs. 11 and 12(2) is contained in Sec. 13 of the '33 Act, 15 U.S.C. Sec. 77m, which provides in part as follows:
 
 
 9
 No action shall be maintained to enforce any liability created under section 77k [Sec. 11] or 771(2) [Sec. 12(2) ] of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... (emphasis added).
 
 
 10
 Section 13 imposes a duty of inquiry on would-be plaintiffs which requires the plaintiff to bring suit within one year after "the plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992). A person is said to be on inquiry notice where "the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded." Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir.1983) (internal quotations omitted). Applying these precepts to this case, we agree with the district court that Jackson National had at its disposal facts from which it could have discovered the misstatements it alleges more than one year before the tolling date.
 
 A. The "All or None" Claims
 
 11
 Jackson National contends that the prospectus falsely stated that the January 1989 public offering would be conducted on an "all-or-none" basis--that is, Merrill Lynch would not close the offering unless all the securities were sold to the public, and if the offering did not close, subscribing investors would have their money returned. Jackson National also claims it was misled because Merrill Lynch did not inform the qualified independent underwriter that the offering could not be closed on an all-or-none basis. In fact, Merrill Lynch never fully distributed the securities to the public and still retains a sizable percentage of the offering. Jackson National bases this claim on language on the first page of the prospectus stating: "None of the Securities will be sold unless all are sold, but the Debt Securities and the Warrants are not being sold as units."
 
 
 12
 We pause to note that the phrase in question is ambiguous since it is not clear whether the required sale of "all" the securities refers to a sale from the issuer to the underwriter, as Merrill Lynch contends, or to a sale from the underwriter to the public, as Jackson National contends. However, even if the language clearly conveyed the meaning Jackson National ascribes to it, the question in this case remains whether Jackson National possessed sufficient facts which would have led it, through the exercise of reasonable diligence, to discover the falsity of this "all-or-none" representation more than one year prior to the June 28, 1991 tolling date. We think there were sufficient early storm warnings to put Jackson National on inquiry notice that this was not an all-or-none offering.
 
 
 13
 First and foremost, the prospectus contained no provisions for escrow accounts and refund arrangements. Escrow provisions are required by law in all-or-none underwritings because funds received must be held in escrow, and, if the target number of securities cannot be sold by the closing date, returned to those who subscribed previously. See Exchange Act Rule 15c2-4(b), 17 C.F.R. Sec. 240.15c2-4(b) (deeming it a "fraudulent, deceptive, or manipulative act or practice" to accept funds in all-or-none offering unless written escrow arrangement is in place); SEC v. Coven, 581 F.2d 1020, 1022 (2d Cir.1978), cert. denied, 440 U.S. 950, 99 S.Ct. 1432, 59 L.Ed.2d 640 (1979). The absence of any provision for a written escrow agreement is virtually conclusive evidence that this was not an all-or-none offering.
 
 
 14
 Additionally, the 1989 Insilco offering was conducted by Merrill Lynch on a "firm commitment" basis. In a firm commitment underwriting, the underwriter agrees to purchase an agreed upon percentage of the offering irrespective of whether the securities can be sold in the public market; therefore, the underwriter bears the risk if the offering is undersubscribed. See SEC v. Coven, 581 F.2d at 1022 n. 2. As the able district judge noted, "it would make little business sense for Merrill Lynch to" agree to buy all the securities from Insilco, and then commit "not to retail a single item unless it could sell the entire inventory." Jackson National Life Ins. Co. v. Merrill Lynch & Co., No. 93 Civ. 0739 (JFK), 1993 WL 464730, at * 3 (S.D.N.Y. Nov. 8, 1993). Indeed, Jackson National acknowledges in its complaint that "[l]anguage such as 'none of the securities will be sold unless all are sold' is almost invariably employed in prospectuses issued only in connection with best efforts underwritings, not firm commitments such as Insilco's." Jackson National thus concedes a circumstance that, taken alone, would warrant further investigation.
 
 
 15
 Finally, if the facts disclosed in the prospectus were not enough to alert a person of ordinary intelligence that fraud potentially was afoot, the May 1990 Offering Memorandum circulated in connection with the recapitalization revealed that sixteen months after the initial distribution, Merrill Lynch "currently" owned about fifty-percent of the securities offered in 1989, and that only a "very limited" market for the securities had developed. Jackson National argues that this disclosure of Merrill Lynch's holdings would be as consistent with a repurchase by Merrill Lynch after an initial full distribution as with a failure to sell the shares in the first place. While that is true, such a substantial holding in the face of an all-or-none offering in a limited market would be so unusual as to raise major questions in the mind of a reasonable investor, and therefore to trigger the duty of inquiry.
 
 
 16
 We have no difficulty in concluding that the aggregate of circumstances in this case was sufficient to put a reasonable investor on notice of the probability that the underwriting was not to be conducted on an all-or-none basis. Therefore, even if we assume the ambiguous language in the prospectus quoted earlier unmistakably gave the misleading impression that the offering was being conducted on an all-or-none basis, Jackson National was on inquiry notice of the falsity of such a representation more than one year before the tolling date.
 
 
 17
 Jackson National's claim that it was misled because the qualified independent underwriter was not informed of the absence of a public market for the securities fails for similar reasons. This claim simply recasts Jackson National's prior assertion that Merrill Lynch concealed the true nature of the underwriting, this time framing it in terms of a nondisclosure to a third party who ultimately would have disclosed to Jackson National the true state of affairs. Because the actual facts concerning the underwriting, including that the alleged all-or-none character was not disclosed to the qualified independent underwriter, could have been discovered by Jackson National through the exercise of reasonable diligence, this claim is time-barred as well.
 
 B. The Insolvency Claim
 
 18
 Jackson National next asserts that the prospectus failed to disclose that the LBO had rendered Insilco insolvent prior to the 1989 offering. The complaint asserts that "[t]he Registration Statement represented that Insilco would be able to meet the debt obligations (both principal and interest) imposed on it as a result of the leveraged buyout, either through the cash flow to be generated by its operations and by borrowing, or by cost savings, or, if necessary, by asset sales." The actual language of the prospectus states:
 
 
 19
 The Company's ability to meet its debt service requirements will require the Company to achieve increases in operating performance and financial results from current levels, or to dispose of assets. There can be no assurance that the Company will be able to achieve such increases in cash flow or effect dispositions that may become necessary.
 
 
 20
 The discussion in the prospectus of Insilco's solvency was in the form of an opinion that "the Company and its subsidiaries considered as one enterprise, (i) have been and will continue to be solvent, (ii) do not have and will not have unreasonably small capital to carry on their businesses and (iii) have been and will continue to be able to pay their debts as they mature." The reasonableness of Jackson National's reliance on this opinion to support its contention that it could not have known of an imminent bankruptcy must be assessed against the actual language of the prospectus. The opinion was contingent on future events--especially the ability to generate increased operating income--over which Insilco had only limited control, and was followed immediately by the caveat that "[n]o assurance can be given, however, that a court would confirm the Company's positions with respect to these [solvency] issues." The prospectus also provided pro forma financial information, the accuracy of which Jackson National does not dispute, showing the impact of the LBO on the company's finances. Furthermore, the prospectus explicitly disclosed the obvious--that the company's high debt-to-equity ratio resulting from the LBO might adversely affect the company's ability to meet principal and interest payments as they came due.
 
 
 21
 These disclosures provided actual notice of potential insolvency, much less the inquiry notice sufficient to trigger the duty to timely investigate and file the complaint. Jackson National knew it was investing in sub-investment grade "junk" bonds, but assumed the considerable risk involved in the hope of receiving a substantial return on its investment. The prospectus fully disclosed the nature of the risks associated with the investment, including the possibility that Insilco's precarious financial condition might prompt a bankruptcy court to deem the company insolvent. In addition, sixteen months later the May 1990 Offering Memorandum revealed that Insilco was not performing as anticipated, and that the company was experiencing severe cash flow problems that might render it unable to meet its current liabilities. Thus, Jackson National was on notice that Insilco's earlier opinion about its ability to continue as a going concern was being eviscerated by later events. Jackson National cannot claim that it lacked notice of Insilco's insolvency when the company's public disclosures warned of the very contingency about which Jackson National now complains. See Brumbaugh v. Princeton Partners, 985 F.2d 157, 163 (4th Cir.1993); I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 762-63 (2d Cir.1991); Landy v. Mitchell Petroleum Technology Corp., 734 F.Supp. 608, 617-18 (S.D.N.Y.1990). Just because Jackson National's high risk investment turned out to be an unworkable one does not allow Jackson National to second-guess its investment decision and plead "fraud by hindsight." Denny v. Barber, 576 F.2d 465, 470 (2d Cir.1978) (Friendly, J.); see Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir.1994) ("misguided optimism is not a cause of action").
 
 II. The Section 20A Claim
 
 22
 The third count of Jackson National's complaint is brought under Sec. 20A of the '34 Act, which contains a five year statute of limitations. Section 20A provides a cause of action against "Any person who violates any provision of this chapter or the rules or regulations thereunder by ... selling a security while in possession of material, nonpublic information...." 15 U.S.C. Sec. 78t-1(a) (emphasis added). The reference to "this chapter" is to the '34 Act, and the language of the statute is thus quite plain that to state a claim under Sec. 20A, a plaintiff must plead a predicate violation of the '34 Act or its rules and regulations. Relying on this clear language, Judge Keenan dismissed Jackson National's claim under Sec. 20A because Jackson National "fail[ed] to allege a violation of the '34 Act independent of its Section 20A claim." Jackson National, 1993 WL 464730, at * 5.
 
 
 23
 Despite the apparent clarity of the statutory language, Jackson National contends that it should be allowed to proceed under Sec. 20A for violations of Secs. 11 and 12(2) of the '33 Act, because the remedies provided by the '33 Act and '34 Act are meant to be cumulative, not exclusive. See Herman & MacLean v. Huddleston, 459 U.S. 375, 386-87, 103 S.Ct. 683, 689-90, 74 L.Ed.2d 548 (1983). While this general proposition certainly holds true, it does not assist Jackson National in this case. Congress added Sec. 20A in the Insider Trading and Securities Fraud Enforcement Act of 1988 to remedy the very specific problems inherent in prosecuting insider trading cases. See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 361, 111 S.Ct. 2773, 2781, 115 L.Ed.2d 321 (1991). Specifically, the five-year limitations period recognizes the "difficulties of ferreting out evidence sufficient to prosecute insider trading cases." Ceres Partners v. GEL Assocs., 918 F.2d 349, 363 (2d Cir.1990). "The language of Sec. 20A makes clear that ... Congress sought to alter the remedies available in insider trading cases, and only in insider trading cases." Gilbertson, 501 U.S. at 362, 111 S.Ct. at 2781 (emphasis in original); see also Kahn, 970 F.2d at 1035-36.
 
 
 24
 Given the narrow focus of Sec. 20A, we must reject Jackson National's invitation to disregard the statute's plain language and apply the statute in the absence of an independent violation of the '34 Act. Because the difficulties of pleading and proving scienter and the other elements of a Rule 10b-5 action do not similarly impede claims under Secs. 11 and 12(2) of the '33 Act, it would skew the legislative balance of interests to apply Sec. 20A's five year limitations period to the lower threshold of liability applicable to the initial distribution of securities under the '33 Act. See Short v. Belleville Shoe Mfg. Co., 908 F.2d 1385, 1391 (7th Cir.1990), cert. denied, 501 U.S. 1250, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991).
 
 
 25
 Moreover, the statute of limitations applicable to Secs. 11 and 12(2), after setting out the one-year "inquiry notice" period, continues: "In no event shall any such action be brought to enforce a liability created under [Sec. 11] more than three years after the security was bona fide offered to the public, or under [Sec. 12(2) ] more than three years after the sale." 15 U.S.C. Sec. 77m. The three-year period is an absolute limitation which applies whether or not the investor could have discovered the violation. SEC v. Seaboard Corp., 677 F.2d 1301, 1308 (9th Cir.1982); Summer v. Land & Leisure, Inc., 664 F.2d 965, 968 (5th Cir.1981), cert. denied, 458 U.S. 1106, 102 S.Ct. 3484, 73 L.Ed.2d 1367 (1982). For us to accept Jackson National's argument would put us in conflict with Congress's evident intent not to permit underwriter and issuer liability to extend beyond the three-year horizon. We therefore hold that Jackson National cannot base its Sec. 20A claim on a violation of Secs. 11 or 12(2) of the '33 Act, and, in order to state a claim under Sec. 20A, must plead as a predicate an independent violation of the '34 Act. As it has not done so, the district court properly dismissed this count of the complaint. See In re Verifone Sec. Litig., 11 F.3d 865, 872 (9th Cir.1993).
 
 CONCLUSION
 
 26
 The judgment of the district court is affirmed.
 
 
 
 *
 Hon. Constance Baker Motley, United States District Judge for the Southern District of New York, sitting by designation