MURPHY, Circuit Judge,
dissenting.
I respectfully dissent. The primary goals of the federal securities laws are to protect investors and to promote full disclosure of relevant information, Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and there was no indication in the Reform Act that its purpose was to undercut those goals or to protect violators from meritorious claims. Although pleading standards for securities fraud cases have been strengthened by the Reform Act, it does not require that a case be proven in the complaint or prevent a case from going forward to discovery when there are allegations that corporate insiders had enhanced motive and opportunity to commit fraud and knew facts suggesting that their public statements were materially inaccurate. Florida State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 661, 665 (8th Cir.2001).
Many relevant facts in securities cases may not be discoverable at the pleading stage because they are known only by key insiders. See In re Navarre Corp. Sec. Litig., 299 F.3d 735, 2002 WL 1760458, slip op. at 14 (8th Cir.2002). This can be especially true if the alleged fraud concerns a special purpose business entity which does not appear on the corporate balance sheet as here. Whether or not appellants can ultimately prove their allegations, or even withstand an eventual summary judgment motion, is not at issue at this stage. The allegations in this case, especially those relating to the nature and timing of both the disclosure of corporate information and the insider trading, meet the new pleading standards and are sufficient to withstand a Rule 12(b)(6) motion.
I.
The allegations in the amended complaint set out significant facts related to K-tel and its failed subsidiary. The sequence of alleged events in relation to each other and to the actions of appellees is of critical importance in determining whether the allegations are sufficient. For that reason it is necessary to recount the allegations here in considerable detail.
During 1997 the price of K-tel’s shares ranged from $1.75 to $4.38, and K-tel formed a media buying and infomercial marketing subsidiary. The subsidiary accumulated significant losses by March 31, 1998, and appellees curtailed its operations at some point during 1998. Before any negative information about the subsidiary was reported, appellees announced in April, 1998 that they would undertake a promising online venture and a 2-for-l stock split. K-tel’s share price rose more than tenfold on the strength of these announcements, from $3.31 on April 9, 1998 to $33.94 on May 5,1998.
*901 Publicly traded companies like K-tel must file quarterly reports with the Securities and Exchange Commission (SEC) for each of the first three quarters of a fiscal year, and the reports are due within 45 days of the end of a quarter. 17 C.F.R. § 249.308a. For the quarter ending March 31,1998, K-tel reported operating losses in a press release on May 5 and in a Form 10-Q filing on May 8. The May 8 filing was the first of at least four consecutive SEC filings that reported quarterly operating losses. These losses were primarily due to the subsidiary, and K-tel’s net tangible assets eventually declined below the minimum requirement for continued listing on Nasdaq. The filing on May 8, 1998, was K-tel’s Form 10-Q for the quarter which ended March 31, 1998. It was signed by appellees Kives, Weiner, and Fischer, and it reported pre tax losses of $1,173,000 for the quarter, compared to pre tax gains of $492,000 in the same period of the previous year. It also reported that the subsidiary had accumulated losses of $1,300,000 and that most of its operations had been curtailed.
The amended complaint alleges that ap-pellees knew at the time of the May 8 filing, or were reckless in not knowing, that the subsidiary had already sustained losses of $1,498,000 and that it was obligated to perform under contracts which would likely result in future losses of approximately $1.8 million. Appellants allege that the balance sheet contained in the filing overstated company earnings because it did not show actual or foreseeable losses. It is further alleged that these nondisclosures on the balance sheet allegedly enabled appellees to report net tangible assets of $4,949,000 and therefore to maintain the listing of K-tel’s shares on the Nasdaq stock market. A company must have at least $4,000,000 in net tangible assets in order to remain listed, and delisting would have seriously impaired the liquidity and value of K-tel stock. On the day that appellees filed the March 10-Q, K-tel’s stock closed at $31.44 per share.
In the month following the May 8 filing, which reported net tangible assets of approximately $5 million, four of the five corporate insider defendants named in the complaint[9] sold very large blocks of K-tel stock. Their sales amounted to approximately 32% of all outstanding K-tel stock (2,680,481 of 8,316,668 shares), and they reaped proceeds of over $40 million. Kives, K-teFs chief executive officer and chairman of its board of directors, sold 2,202,303 shares for $26,312,153. Weiner, president of K-tel until his resignation in August, 1998, sold 390,000 shares for $11,755,420. Fischer, chief financial' officer, sold 6,000 shares for $195,660. Koblick, an executive vice president and director, sold 82,178 shares for $2,661,005. Kieves, the only individual appellee who did not sell stock during the May period, was a member of K-tel’s board of directors at that time and became a manager only when he was appointed president in October, 1998.
From the allegations relating to the number of K-tel shares owned by the individual appellees and documents underlying the pleadings, percentages may be calculated about their transactions. Kives sold approximately 39% of his entire holdings during this period at share prices ranging from $33.31 to $10.95.[10] The other individual appellees sold at least 49% of their *902 aggregate holdings[11] at share prices ranging from $34.25 to $22.51. The daily closing price of K-tel’s shares dropped from $33.22 to'$11.25 during this period of insider trading.
The SEC requires publicly traded companies to file annual reports within 90 days of the end of a fiscal year, 17 C.F.R. § 249.310, and K-tel filed its annual report for the fiscal year ending June 30, 1998 on October 13, 1998.[12] The October 13 filing was signed by Kives, Fischer, Kobliek, and Kieves, and it was audited by the accounting firm of Arthur Andersen, LLP. It reported a net operating loss of $2,407,000 for fiscal year 1998, as opposed to a gain of $3,204,000 for fiscal year 1997. The annual report attributed K-tel’s negative cash flow primarily to losses of the defunct media buying subsidiary and stated: “As of June 30,1998, due to accumulated losses of $2,300,000, the Company had curtailed most of these media buying operations.” The October 13 filing also pegged K-tel’s net tangible assets at $3,774,000, an amount below Nasdaq’s $4,000,000 minimum requirement for continued listing. K-tel’s shares closed at $5.38 after the filing.
Key allegations in the amended complaint state that in April appellees announced a new venture and a stock split that increased the value of K-tel stock tenfold, and then sold off their own stock for millions of dollars in May and June. This was at a time that, according to statements by appellees, the subsidiary’s operations had been curtailed although it was continuing to run up losses. When appel-lees began to sell their stock immediately after they disclosed poor quarterly results on May 8, the accumulated losses and impaired assets of the subsidiary had not been accrued on K-tel’s balance sheet. Fiscal year results were released in October that revealed large operating losses and net tangible assets insufficient to remain listed on the Nasdaq market. The pleadings, and reasonable inferences from them, thus allege a sequence in which insiders touted favorable information about the company, sold shares of their own, and only later revealed the true financial condition of K-tel.
A similar pattern is alleged for the fall of 1998, but with less insider trading. In November appellees publicly announced a strategic partnership with Playboy Online [13] and an agreement to include K-tel’s online music store on The Microsoft Network’s Shopping Channel.[14] More significantly, Kieves is alleged to have appeared on CNBC on November 10, 1998 when he stated that K-tel was “looking at several strategic opportunities.. .including most traditional financing options [including] a secondary offering.... ” These announcements drove K-tel’s share price up from $6.88 to $32.63. Appellees issued a press release thereafter, on November 12, 1998, which projected losses for the quarter ending September 30, 1998.[15] K-tel’s share *903 price slid to $17.63 on November 16, 1998.[16]
During the week of October 19, 1998 K-tel received a letter from Nasdaq threatening to delist its shares, but appellees did not announce or disclose it until after business hours on November 16 when they filed K-tel’s Form 10-Q for the quarter ending September 30,1998.[17] The November filing was signed by appellees Kives, Kieves, and Fischer. It disclosed that “[t]he Company has been notified by the Nasdaq Stock Market that the Company failed to meet the minimum tangible net asset requirement necessary for continued listing on the Nasdaq National Market” and that “[t]here is no assurance that the Company will be successful in its attempt to remain listed.... ” The same report also showed net tangible assets of $912,000 and quarterly operating losses of $3,131,000. For the first time, the November 16 filing recognized an operating loss of $800,000 which had been incurred by the subsidiary for “write-offs of certain infomercials and remaining deferred media assets... because management determined such assets were not realizable.” Appellants allege that another operating loss of $698,000 due to the subsidiary was later recognized in K-tel’s 10-Q for the quarter ending March 31,1999.
The major news services reported K-tel’s receipt of the delisting letter at approximately 11:30 a.m. on November 17, 1998. K-tel’s stock price immediately dropped 20% and was down 32% by the end of the day, at $12.00 per share. Fischer sold 15,000 shares for $247,290 on the same day.[18] His sales occurred at prices approximately midway between the daily high and the stock’s closing price for the day.[19] The exact time of the sales is not alleged and presumably unknown by appellants, but a possible inference is that the sell order could have been given before the disclosure even if the transaction occurred later.
The amended complaint alleges that ap-pellees knew that the subsidiary’s assets were impaired and that its losses were certain, but that recognizing those losses on K-tel’s balance sheet would have lowered the company’s stock price and threatened its continued listing on Nasdaq. Ap-pellees allegedly delayed recognition of these losses, in violation of Generally Accepted Accounting Practices (GAAP), and delayed disclosure of the Nasdaq delisting letter while publicly touting a new partnership and a new online venture. It is alleged that the strategic nondisclosures kept K-tel’s stock price artificially high while the individual appellees sold millions of shares in violation of § 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b), and related Rule 10b-5, 17 C.F.R. § 240.10b-5.[20] Underlying the allegations *904 in the amended complaint are four of liters SEC filings, four company press releases from the period in question, and a graph of K-Tel’s stock performance in calendar year 1998. See Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir.1999) (court may take notice of public documents in reviewing dismissal on pleadings).
II.
In reviewing de novo a dismissal under Rule 12(b)(6), “we must assume all factual allegations in the complaint are true,” and “the plaintiff is entitled to all reasonable inferences that may be drawn from the allegations of the complaint.” Florida State Bd. of Admin., 270 F.3d at 660. As to scienter, however, the sum of the reasonable inferences must be strong in order to proceed to discovery. Id. A complaint should only be dismissed for failure to state a claim if “it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.” Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 (8th Cir.1997), quoting Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir.1982).
To state a violation of § 10(b)[21] or Rule 10b-5,[22] a plaintiff must allege: (1) a false statement or omission of material fact occurring in connection with the purchase or sale of a security; (2) scienter; (3) reliance; and (4) damages. Alpern v. Utili-Corp United, Inc., 84 F.3d 1525, 1533-34 (8th Cir.1996). An omission occurs upon a breach of a duty to disclose, which arises if a statute or regulation requires it, if it is necessary to prevent a voluntary statement from being misleading, or if corporate insiders trade on confidential information. See Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26-27 (1st Cir.1987). The parties do not dispute that the misrepresentations alleged in this case would be material if proven. The questions on appeal are whether the pleadings sufficiently allege that appellees made false statements or omissions and whether they acted with scienter.
Each element of fraud must be pled with particularity. See Fed.R.Civ.P. 9(b) (all elements of fraud except scienter must be pleaded with particularity); 15 U.S.C. 78u-4(b)(2) (in securities fraud action, scienter must be pled with particularity). Nevertheless, our court has recently recognized that investors “need not plead.. .precise details.. .where the subject matter of the fraud is uniquely within the defendants’ knowledge or control.” In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, at 14. In respect to the element of scienter, a plaintiff must plead facts “giving rise to a strong inference,” 15 U.S.C. 78u-4(b)(2), that the defendant acted intentionally or recklessly. Van Dyke v. Coburn Enterprises, Inc., 873 F.2d 1094, 1100 (8th Cir.1989).
The amended complaint alleges that Rives, Weiner, and Fischer signed Z-tel’s March 10-Q on May 8, 1998 and that the filing was false and misleading because the balance sheet contained in it failed to recognize the subsidiary’s losses and the impairment of its assets in violation of Statements of Financial Accounting Standards (SFAS) 121 and 5. The amended complaint *905 thus identifies “who made the alleged announcement, where it was made, what it entailed, [and] when it was made.” In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, at 13. The issue on appeal is whether the amended complaint is deficient because it did not adequately plead “why it was false when made.” Id.
The May 8 filing, signed by three appel-lees, states that the subsidiary had already incurred operating losses of $1,300,000 by March 31, 1998, and the October 13 filing, signed by four appellees, shows that the subsidiary incurred an additional $1,000,000 in operating losses between March 31 and June 30, 1998. While the May 8 filing claimed that the subsidiary’s operations had been curtailed as of March 31, 1998, the October 13 filing stated that they were not concluded until June 30, 1998. The pleadings allege that appellees knew as of May 8 that the subsidiary’s closure was imminent, that its losses and the impairment of its assets either had occurred or were reasonably certain to occur, and that appellees’ failure to recognize any portion of these losses in the March 10-Q balance sheet was misleading and in violation of GAAP.
The accounting standards are designed to give a realistic picture of a company’s financial condition. Robert S. Kay & D. Gerald Searfoss, Handbook of Accounting and Auditing, ch. 1, at 4 (2d ed.1989). SFAS 121 “requires that long-lived assets and certain identifiable intangibles to be held and used by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable.” Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets To Be Disposed Of, Statement of Financial Accounting Standards No. 121, Summary (Financial Accounting Standards Bd.1995). SFAS 5 requires that a corporation disclose a loss contingency “when there is at least a reasonable possibility that a loss or an additional loss may have been incurred.” Accounting for Contingencies, Statement of Financial Accounting Standards No. 5, § 10 (Financial Accounting Standards Bd.1975). An estimated loss from a loss contingency “shall be accrued by a charge to income” if two conditions are met: (1) available information suggests that an asset has been impaired and it is probable that future events will confirm the loss, and (2) the amount of the loss can be reasonably estimated. Id. at § 8. These standards seek to bring relevant information to the market at the earliest opportunity.
The amended complaint alleges that by the time the March 10-Q was filed on May 8, losses incurred by K-tel’s subsidiary had triggered a duty under SFAS 121 for the company to conduct an impairment review of its long term assets and identifiable intangibles and a duty under SFAS 5 to disclose an estimated loss from a loss contingency on the company’s balance sheet. It is also alleged that K-Tel had not curtailed most of its media buying operations as it later claimed in SEC filings, but that in fact K-Tel continued to be “obligated to perform under one or more contracts which were likely to result in additional future losses of approximately $1.8 million.” The district court believed that the allegations were not pled with sufficient particularity because they did not include the terms of the alleged contracts and did not specify that the subsidiary or any of its property was a “long-lived asset” or an “identifiable intangible,” that the sum of any future cash flows was less than the asset’s carrying amount, or that future losses from the asset were inevitable.
The accounting standards are not bright line rules, and application of them requires judgment calls. See Shalala v. Guernsey Mem’l Hosp., 514 U.S. 87, 100, 115 S.Ct. *906 1232, 131 L.Ed.2d 106 (1995), citing Kay & Searfoss, ch. 5, at 7. The nature of accounting makes it unreasonable to expect securities fraud plaintiffs to plead GAAP violations with the most exacting particularity, especially “where the subject matter of the fraud is uniquely within the defendants’ knowledge or control.” In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, at 14. The allegations here concern operations of and accounting for an off balance sheet corporate entity so only insiders would normally have access to the relevant information. A subsidiary engaged in media buying and infomercial marketing might be presumed to own identifiable intangible assets such as copyrights, licenses, or record masters, see Kay & Searfoss, ch. 15, at 35-36, as well as long term assets such as equipment, see id., ch. 15, at 2. The allegation that the subsidiary was obligated to perform under unprofitable contracts should be considered together with other allegations relating to the losses reported after the subsidiary’s operations were shut down. It is not an unreasonable inference that losses occurring after closure resulted from preexisting obligations, and reasonable inferences arising from the amended complaint must be regarded as true at this stage of the case. Florida State Bd. of Admin., 270 F.3d at 660.
A securities fraud complaint need not allege GAAP violations to establish that a material misstatement occurred in a company’s financial statement. The accounting standards and the requirements of Rule 10b-5 are not “perfectly coextensive.” Malone v. Microdyne Corp., 26 F.3d 471, 478 (4th Cir.1994). Compliance with GAAP does not provide immunity from 10b-5 liability, id. at 478, and accountants have been held criminally liable for certifying false or misleading financial statements even though they followed GAAP. United States v. Simon, 425 F.2d 796, 805-06 (2d Cir.1969). Without discovery plaintiffs have not had access to detailed information about K-tel’s business units, their assets, or their operations, and it is not necessary at this stage to plead accounting irregularities with greater specificity than was done by the plaintiffs here. See In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, at 14, 15. The amended complaint alleges facts sufficient to show that K-tel’s publicly filed balance sheets potentially contained material misstatements or omissions under Rule 10b-5.
The amended pleadings in this case identified specific statements attributable to appellees that allegedly inflated K-tel’s earnings and net tangible assets by hiding specific losses that were also identified. Appellants have not relied on generalized imputations of scienter based on the individual appellees’ positions within the corporation, cf. In re Advanta Corp. Sec. Litig., 180 F.3d 525, 539 (3rd Cir.1999), nor is this a case where the pleadings repeatedly fail to show who made the alleged misstatement, when it was made, where it was made, what it entailed, and why it was false. Cf. In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, at 14-15. Appellants here have alleged that each individual appellee signed at least one of K-tel’s SEC filings which blamed the subsidiary for K-tel’s poor performance and yet failed to recognize its losses or the impairment of its assets on the balance sheet in violation of GAAP.
The amended complaint also alleges that K-tel breached its duty to disclose the delisting letter, a duty which arose when appellees made November announcements touting the company. The majority claims that the delisting letter was unrelated to the subject matter of any of the November announcements, but a delisting directly impairs a publicly traded company’s ability to raise capital and is therefore highly relevant to any public statement concerning *907 capitalization or financing. Kieves allegedly appeared on CNBC on November 10, 1998 and discussed the company’s consideration of “most traditional financing options [including] a secondary offering,” and a finder of fact could conclude that Kieves had a duty to disclose K-tel’s receipt of the delisting letter at that time. The majority states that failure to disclose the delisting letter in the November 12 press release may have created a jury question, but it then reaches the puzzling conclusion that failure to disclose it before November 16 is insufficient as a matter of law to permit the case to go forward. The nondisclosure of the delisting letter may not have impacted most of the insider sales, but it contributes to a reasonable inference that appellees acted deliberately to inflate K-tel’s share price artificially.
The Reform Act “does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs.” Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir.2000) (emphasis in original). Our court requires that “investors must plead with particularity the who, what, when, where, and how of [an] alleged scheme,” In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, at 15, and appellants here have met that burden. The amended complaint alleges facts from which it could be inferred that appellees knew, or had reason to know, that the balance sheet in K-tel’s May 8 filing was false when made and that Kieves’ November 10 discussion of K-tel’s financing options was misleading at the time.
III.
The new pleading standards require a securities fraud plaintiff to “state with particularity facts giving rise to a strong inference” that a defendant acted with scien-ter, 15 U.S.C. 78u-4(b)(2). One important way to demonstrate a strong inference of scienter is to make a showing of heightened motive and opportunity to commit fraud. Florida State Bd. of Admin., 270 F.3d at 660. An unusually large executive compensation package is one indication of heightened motive and opportunity, id. at 661, and an unusual pattern of insider trading is another. Id. at 656. See also In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74 (2d Cir.2001); Rothman v. Gregor, 220 F.3d 81, 94 (2d Cir.2000). “[I]n the insider trading ease, trading at a particular time is circumstantial evidence that the insider knew the best time to trade because he or she had inside information not shared by the public. This in turn is circumstantial evidence that he or she kept the information from the public in order to trade on the unfair advantage.” Florida State Bd. of Admin., 270 F.3d at 656. Whether a pattern of insider trading is unusual depends upon such factors as the timing of the sales, the percentage of stock holdings sold, the amount of profit derived from them, and the number of insiders selling. Id. at 659. See also In re Scholastic, 252 F.3d at 74-75.
The amended complaint alleges sufficient facts to show the insider sales here to be suspicious in each of the ways identified by Florida State Bd. of Admin. During the class period, four of five individual appellees are alleged to have sold between 39% and 95% of their holdings at a time when the alleged nondisclosures could have artificially inflated the share price so that sales proceeds amounted to more than $41 million. Kives sold 39% of his holdings and received approximately $26 million on his sales. His individual codefend-ants apparently sold at least 49% of their aggregate holdings for approximately $15 million. An inference may be drawn from the allegations that the motive for these sales was personal profit rather than any institutional need.
*908 This is not a ease where only a single insider benefitted, see, e.g., San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 814 (2d Cir.1996), or where a significant number of insiders have not benefit-ted at all. See In re Advanta Corp., 180 F.3d at 540 (inference weakened when only four of seven individual defendants traded); Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir.1995) (inference undermined when only one of four individual defendants traded). Fives may have bene-fitted the most, but the allegations on motive are not undercut by the fact that different appellees profited unequally from the alleged scheme. Florida State Bd. of Admin., 270 F.3d at 664-65. It is not suspicious for an insider to sell a relatively small percentage of his holdings, see Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir.2001) (17% not suspicious); Acito, 47 F.3d at 54 (11% not suspicious); Rothman, 220 F.3d at 95 (9.3% not suspicious), but when a larger percentage is sold the timing of the sales is critical to determine whether they contribute to a strong inference of scienter.
It is suspicious when insider sales occur at a time when alleged nondisclosures could have artificially inflated the stock’s price, see In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, at 19, and that is what is alleged here. The vast majority of the sales began when K-tel’s share price was approximately $31.44 on May 8, 1998, a price nearly ten times higher than before appellees had made their announcements of a new online venture and stock split, and nearly equivalent to the stock’s 1998 high of $33.94 which occurred on May 5, 1998. The sales occurred immediately after the alleged nondisclosures and at the beginning of a prolonged period of operating losses and diminishing net tangible assets.
This is not a case in which the timing of the sales undercuts the allegations of fraud, and the insider sales here did not occur before the alleged fraud took place, see In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092 (9th Cir.2002) (38% not suspicious because majority of sales occurred before fraud could have occurred), or at a particularly disadvantageous time within the class period, see Ronconi, 253 F.3d at 435 (69% not suspicious because sales occurred near lowest point in stock price during class period). In contrast, the insider sales here occurred when the share price was near its peak, at the time when the alleged fraudulent scheme to suppress unfavorable information would have had the most significant impact on that price.
The situation here is not unlike the Second Circuit case Stevelman v. Alias Research Inc., 174 F.3d 79 (2d. Cir.1999). A president and CEO in that case sold 40% his company holdings for $3.5 million, and several other insiders liquidated unknown percentages of their holdings. Id. 82. The trading was done during the same period that the insiders were alleged have overstated corporate earnings. Id. 82, 85. The court concluded that “the insider trading alleged.. .in combination with the timing of the misrepresentations, satisfies the pleading requirements of Rule for the purposes of the scienter element of section 10(b) and Rule 10b-5.” Id. 86. The magnitude and the timing of insider trading alleged here is similarly suspicious. Fives sold 39% of his holdings approximately $26 million, and his co-defendants apparently sold at least 49% of aggregate holdings for approximately million, during the time they are alto have overstated F-tel’s net tangi-assets.
The allegations of insider sales at F-tel reflect transactions greater in magnitude *909 and more suspicious in timing than the insider sales deemed “unusual” in In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, at 19 (all six individual defendants sold between 10% and 100% of their holdings for $11.5 million). The pleadings in that case were insufficient to establish a strong inference of scienter from insider trades because they did not allege misrepresentations with particularity. Id. at 20. There is no such “missing link” in the allegations here. Id. Appellants have pled the who, what, when, where, and how of the alleged fraud, and the magnitude and timing of the insider sales in this case buttress the inference that appellees’ filings contained intentional or reckless misstatements. See Florida State Bd. of Admin., 270 F.3d at 660 (“[I]n some cases the same circumstantial allegations that establish motive and opportunity also give additional reason to believe the defendant’s misrepresentation was knowing or reckless.”).
In the year before the class period, K-tel stock never closed at a price higher than $4.38 per share. During the class period, appellees publicly touted online ventures that dramatically raised share prices, sold large portions of their holdings at prices ranging from $10.95 to $34.25, and lagged in disclosing unfavorable financial information which eventually led to and included the delisting letter.
A securities fraud action cannot proceed on “GAAP violations or accounting irregularities, standing alone,” Novak, 216 F.3d at 309, but appellants here have alleged far more. Our court has determined that allegations relevant to the scienter issue include “insider trading in conjunction with false or misleading statements;... disregard of current factual information acquired prior to the statement at issue; accounting shenanigans; and evidence of actions taken solely out of self-interest.” In re Navarre Corp., 299 F.3d 735, 2002 WL 1760458, at 20, quoting Geffon v. Micrion Corp., 249 F.3d 29, 36 (1st Cir.2001). Appellants have made detailed allegations of each of these factors sufficient to survive a motion to dismiss.
IV.
The Securities Exchange Act of 1934 was enacted in part because securities prices “are susceptible to manipulation and control.. .resulting in sudden and unreasonable fluctuations.” 15 U.S.C. § 78b. It was intended to protect investors from fraud and to promote disclosure of information. Hochfelder, 425 U.S. at 194, 96 S.Ct. 1375. Congress did not abandon these overarching objectives when it passed the Reform Act, and “[o]ur willingness to draw inferences in favor of the plaintiff remains unchanged” under the new pleading standards. Helwig v. Vencor, Inc., 251 F.3d 540, 553 (6th Cir.2001) (en banc). “While Congress unquestionably strengthened the pleading standard for securities fraud, the Reform Act would hardly serve its purpose 'to protect investors and to maintain confidence in the securities markets’ were it to become a choke-point for meritorious claims.” Id., quoting H.R. Conf. Rep. No. 104-369, at 31 (1995), U.S.Code Cong. & Admin. News at 730.
The amended complaint must be viewed in the light most favorable to appellants. Parnes, 122 F.3d at 546. It alleges that appellees signed SEC filings which linked K-tel’s poor financial performance to the subsidiary’s losses as early as March 31, 1998. Although appellees are alleged to have known about these losses, they nevertheless delayed recognizing them on K-tel’s balance sheet for a number of months. During that time they sold large blocks of company stock for approximately $41 million. Although corporate officials “need not be clairvoyant” and “are only responsi *910 ble for revealing those material facts reasonably available to them,” Novak, 216 F.3d at 309, the corporate insiders here have been charged in the amended complaint with actual knowledge of the subsidiary’s material losses and the receipt of a delisting letter at the time when they signed K-tel’s various public filings. Some securities fraud complaints give “no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation,” but the allegations here strongly suggest that the May 8 filing and Kieves’ November 10 statements were “misleading when made.” City of Philadelphia v. Fleming Cos., Inc., 264 F.3d 1245, 1260 (10th Cir.2001) (emphasis in original).
A fundamental principle of accounting is that losses must be recognized as soon as they are reasonably certain and measurable, Kay & Searfoss, Ch. 2, at 8-13, and the amended complaint alleges with sufficient particularity that appellees failed to do this. The nature and timing of the alleged nondisclosures, together with the magnitude and timing of appellees’ stock sales, meet the heightened pleading requirements of the Reform Act. See Florida State Bd. of Admin., 270 F.3d at 661 (strong inference of scienter based on magnitude of executive compensation package and timing of alleged misstatements); Stevelman, 174 F.3d at 86 (strong inference of scienter based on magnitude of insider sales and timing of alleged misstatements). Cf. Novak, 216 F.3d at 309 (strong inference of scienter when corporate insiders allegedly delayed markdowns of worthless inventory).
For these reasons the dismissal by the district court should be reversed, and the case remanded for discovery and further proceedings.[23]

. It appears that Fischer and Weiner were never served with the amended complaint, but the district court treated them as parties and dismissed the action in respect to all named defendants.

. Kives owned approximately 42% of K-tel’s 8,335,668 outstanding shares as of September 1998 (i.e. 3,500,980 shares). At the beginning of May he owned 5,703,283 shares. From May 8 to June 9, 1998, he sold 2,202,303 shares. His sales during the May period thus liquidated approximately 39% of his holdings.

. The individual appellees other than Kives sold 478,178 shares during the May period. As of September 11, 1998, the total number of shares held by affiliates of K-tel other than Kives was 555,313. Fischer owned at least 24,000 of them because he liquidated that amount in November, 1998. During the May period, the individual appellees other than Kives apparently liquidated from 49% to 95% of their aggregate holdings.

. K-tel had received a two week extension of the filing deadline from the SEC on the ground that its receipt of material information from subsidiaries had been delayed. The amended complaint alleges that the late filing was part of appellees' strategy to delay disclosure and hide K-tel’s true financial condition.

. A copy of the press release included in the record shows that Kives was quoted in it.

. Kieves was quoted in the press release.

. The press release quoted Kives and Kieves and listed Fischer as a contact.

. During this decline, defendant Koblick exercised options to purchase 27,200 shares at $3.06 per share.

. A transmittal sheet that accompanies the September 10-Q shows that the SEC received it at 7:11 p.m. on November 16, 1998.

. Fischer also sold 9,000 shares for $90,000 on November 18, 1998.

. The high price for the day was $21.25, and the closing price was $12. The sales occurred at prices of $18.31 and $16.03.

.The individual appellees are alleged to be liable as control persons under § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), and all of them except Kieves are alleged to be liable for selling securities while in possession of material nonpublic information in violation of § 20A of the 1934 Act, 15 U.S.C. § 78t-1. The § 10(b) and Rule 10b-5 claims are predicates to § 20(a) liability, see Deviries v. Prudential-Bache Sec., Inc., 805 F.2d 326, 329 (8th Cir.1986), and to § 20A liability, see Jackson Nat’l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 703 (2d Cir.1994). These theories cannot go forward if the predicate claims are dismissed.

. Section 10(b) prohibits use of “any manipulative or deceptive device or contrivance” in connection with the purchase or sale of any security “in contravention of such rules and regulations as the Commission may prescribe.” 15 U.S.C. § 78j(b).

. Rule 10b-5 forbids any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances 'under which they were made, not misleading... in connection with the purchase or sale of any security.” 17 C.F.R. § 240.10b-5.

. The district court denied appellants’ request for leave to amend the amended complaint on the ground that any attempt to cure its defects would be futile. The record here does not suggest that appellants acted in bad faith or were dilatory in filing the amended complaint, for they filed it within three months of the order appointing them lead plaintiffs in the case. Any delay must have been prejudicial to the opposing side to justify denial of leave to amend, Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 644 F.2d 690, 694 (8th Cir.1981), and the record does not reflect prejudice.