**Donald JOHNSON, Individually and On Behalf of All Others Similarly Situated, Plaintiff,**

v.

**James D. ALJIAN, Kirk Kerkorian, and Tracinda Corporation, Defendants.**

**No. 03–5986 FMC (PJWx).**

United States District Court, C.D. California.

July 30, 2004.

Christopher Kim, Lisa J. Yang, Lim Ruger & Kim, Los Angeles, CA, Christopher L. Nelson, Jacob A. Goldberg, Marc A. Topaz, Richard A. Maniskas, Schiffrin & Barroway, Bala Cynwyd, PA, Douglas M. Leavitt, Danziger Shapiro & Leavitt, Philadelphia, PA, for Plaintiff.

Eric N. Landau, Kristel Adriane Massey, Shawn M. Harpen, McDermott Will & Emery, Irvine, CA, Eric Peter Early, Terry N. Christensen, Timothy Yuchi Sung, Christensen Miller Fink Jacobs Glaser Weil & Shapiro, Los Angeles, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS

COOPER, District Judge.

This matter is before the Court on Defendants' Motions to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) (docket # 18, 20). This matter was heard on July 12, 2004, at which time the parties were in receipt of the Court's tentative Order. After oral argument, the Court took the matter under submission. For the reasons set forth below, the Court **hereby grants in part and denies in part** Defendants' Motions to Dismiss.

## I. Background

### A. Nature of the Case

This is an as-yet-uncertified securities fraud class action brought by Plaintiff Donald Johnson on behalf of himself and a Class consisting of all other persons who purchased the common stock of Daimler-Chrysler AG ("DCX") on nine different dates between March 19, 1999 and June 11, 1999 (the "Purchase Dates"). Plaintiff seeks damages based on Defendants' alleged violations of the Securities Exchange Act of 1934 (the "1934 Act"). Plaintiff asserts claims against three Defendants: 1) Tracinda Corporation ("Tracinda") 2) Kirk Kerkorian ("Kerkorian"), and 3) James D. Aljian ("Aljian").[1] Tracinda Corporation is wholly owned by Kerkorian. Aljian is an officer of Tracinda and a member of the DaimlerChrysler Shareholder Committee.

### B. Plaintiff's Claims

Plaintiff asserts the following claims: (1) violations of § 10(b) of the 1934 Act and Rules 10b–5 and 10b5–1 promulgated thereunder (15 U.S.C. § 78j; 17 C.F.R. §§ 240.10b–5, 240.10b5–1) against all Defendants; (2) control person liability based on § 20(a) of the 1934 Act (15 U.S.C. § 78t) against the individual Defendants; and (3) contemporaneous trading liability based on § 20A(a) of the 1934 Act (15 U.S.C. § 78t–1) against all Defendants.[2]

### C. Plaintiff's Allegations

Plaintiff alleges the following in the Complaint:

On February 24, 1999, Aljian attended a Shareholders Committee Meeting at which the attendees were given a board report ("the Report"), marked "strictly confidential," entitled "Daimler Chrysler Operative Planning 1999–2001." (Compl. ¶ 3). The Report projected a "significant" free cash flow decline. *Id.* After the meeting, Aljian returned to Tracinda's offices and placed the Report in Tracinda's central files. (Compl. ¶ 4). These files were readily accessible to Kerkorian; Aljian knew they were accessible to Kerkorian. *Id.*

In March 1999, Aljian obtained knowledge of information contained in the Report; specifically he obtained knowledge regarding the significant decline in DaimlerChrysler's cash flow in 1999. (Compl. ¶ 5).

On March 19, 1999, Tracinda sold one million shares of DCX for $93,746,866.66. *Id.* Between March 19, 1999, and June 11, 1999, Tracinda sold a total of 7,642,241 DCX shares for proceeds totaling $661,677,282. (Compl. ¶¶ 6, 30–31).

Shortly after these sales were completed, on July 29, 1999, information regarding DaimlerChrysler's declining cash flow went public, resulting in an 8.8% decline in the stock's value. (Compl. ¶¶ 33–34.)

Aljian was responsible for overseeing the investment decisions of Tracinda, and Aljian and Kerkorian regularly conferred regarding whether to sell shares held by Tracinda. (Compl. ¶ 4).

### D. The Present Action

This action was filed on August 21, 2003; the First Amended Complaint ("FAC") was filed on January 23, 2004.

---

1. Collectively, Kerkorian and Aljian are referred to as "the individual Defendants."

2. Specifically, Plaintiff asserts a claim against Defendants Tracinda and Kerkorian based on § 20A(a), 15 U.S.C. § 78t–1(a), which imposes liability on persons who engage in insider trading for damages suffered by individuals who trade contemporaneously with the insider. Plaintiff also asserts a claim against Defendant Aljian based on § 20A(c) of the 1934 Act, 15 U.S.C. § 78t–1(c), which imposes joint and several liability on tippers.

## II. Standard for Dismissal Pursuant to Fed.R.Civ.P. 12(b)(6)

Defendants' Motion requires the Court to determine whether the Complaint states any claim upon which relief may be granted. *See* Fed R. Civ. P. 12(b)(6). The Court will not dismiss Plaintiff's claims for relief unless he cannot prove any set of facts in support of his claims that would entitle him to relief. *See Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295 (9th Cir.1998). In limiting its inquiry to the content of the Complaint, the Court must take the allegations of material fact as true and construe them in the light most favorable to the plaintiff. *See Western Reserve Oil & Gas Co. v. New,* 765 F.2d 1428, 1430 (9th Cir.1985). Additionally, the Court "is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot be reasonably drawn from the facts alleged." *Clegg v. Cult Awareness Network,* 18 F.3d 752, 755 (9th Cir.1994).

## III. Statute of Limitations

### A. Statute of Limitations Governing § 10(b) and § 20(a)

#### 1. Conduct Prohibited by § 10(b) and § 20(a)

Generally, § 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder "prohibits any person from using or employing any 'manipulative or deceptive device' in connection with the sale of a security." *In re VeriFone Securities Litigation,* 11 F.3d 865, 868 (9th Cir.1993) (citing 17 C.F.R. § 240.10b-5).

A violation of § 20(a) of the 1934 Act requires: "(1) a primary violation of federal securities laws ... and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Systems, Inc.,* 228 F.3d 1057, 1065 (9th Cir.2000). A primary violation consists of the "transactions giving rise to the alleged securities violation." *Id.* (in-

ternal citations omitted). Here, the alleged primary violation is based on § 10(b) and Rule 10b-5.

#### 2. Pre-1991 Statute of Limitations

The 1934 Act did not set a limitations period for § 10(b) claims. *See Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 876 (9th Cir.1984). Prior to 1991, courts disagreed about the proper statute of limitations for such claims. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 354, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991), *superseded on other grounds by* Pub.L. 102-242, § 476, 105 Stat. 2236 (1991) (providing that the pre-*Lampf* statute of limitations applied to actions pending at the time of the Supreme Court's decision in *Lampf*). Many courts, including the Ninth Circuit, "borrowed" the most analogous state statute of limitations. *Mosesian,* 727 F.2d at 876 ("Congress did not provide a statute of limitations for private actions brought under section 10(b) .... The federal courts therefore borrow the forum state's statute of limitations for fraud actions.").

In 1991, however, the Supreme Court set a uniform statute of limitations: "one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf,* 501 U.S. at 364, 111 S.Ct. 2773; *accord Sterlin v. Biomune Systems,* 154 F.3d 1191, 1195 (10th Cir.1998); *In re Heritage Bond Litigation,* 289 F.Supp.2d 1132, 1148-49 (C.D.Cal.2003).

#### 3. The Sarbanes-Oxley Act of 2002

In 2002, Congress enacted the Sarbanes-Oxley Act of 2002 ("the SOA"), which lengthened the statute of limitations for claims "involv[ing] fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws" to the lesser of "(1) 2

years after the discovery of the facts constituting the violation[,] or (2) five years after such violation." Pub.L. No. 107–204, § 804(a), 116 Stat. 745 (2002).[3] Because Plaintiff has not alleged that he discovered the facts underlying the claims at a date that would trigger the shorter period, the Court will use the longer one.

The Complaint was filed on August 21, 2003. Plaintiff alleges that Defendants' last violation of §§ 10(b) and 20(a) occurred on June 11, 1999. Prior to the SOA, enacted on July 30, 2002, these claims would have clearly been barred by the 1934 Act's then-applicable three-year statute of limitations. *Lampf,* 501 U.S. at 364, 111 S.Ct. 2773.

The SOA increased the one-to-three-year statute of limitations for §§ 10(b) and 20(a) claims to a two-to-five-year period. *See* Pub.L. No. 107–204, § 804(a).[4] The SOA states that it applies "to all proceedings ... commenced on or after the date of enactment of this Act." *Id.* at § 804 (codified at 28 U.S.C. § 1658(b), 2002 Amendment Note).

Plaintiff argues that, notwithstanding the fact that the SOA was passed over a month after the statute of limitations on Plaintiff's claims had expired, his expired claims were revived because he filed his Complaint after the SOA's enactment, and within five years of the alleged violations. The Court is unpersuaded.

#### 4. *Landgraf* Retroactivity .

The SOA does not expressly *include* actions that accrued prior to its passage; rather, it applies to proceedings "commenced on or after" its enactment. The Supreme Court has recognized that, absent an explicit provision applying new legislation retroactively, courts should not imply one: "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 265, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994) (holding that damage provisions of the Civil Rights Act of 1991 did not apply to a case pending on appeal when the statute was enacted). As the Supreme Court recognized, a statute's retroactive application can result in the "unfairness of imposing new burdens on persons after the fact." *Id.* at 270, 114 S.Ct. 1483. Therefore, courts will construe statutes to apply retroactively only when "Congress first make its intention clear" that the statute is to be so applied. *Id.* at 268, 114 S.Ct. 1483. This requirement assures the Court that "Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable

---

**3.** This provision was codified in Title 28, not Title 15. The new statute of limitations provides:

(b) ... [A] private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation. 28 U.S.C. § 1658(b).

**4.** Specifically, Congress kept in place § 10(b)'s two-tiered statute of limitations. Af-

ter *Lampf* was decided in 1991, but prior to the passage of the SOA in 2002, § 10(b) claims were subject to a limitations period of the lesser of (1) one year after the discovery of the facts constituting the violation; or (2) within three years after such violation. *Lampf,* 501 U.S. at 364, 111 S.Ct. 2773. The SOA extended the statute of limitations, but left the two-tiered structure intact. Pub.L. No. 107–204, § 804(a). The statute of limitations for securities fraud is now the lesser of two years after discovery or five years after the violation. *Id.* (codified at 28 U.S.C. § 1658(b)(1)-(2)).

price to pay for the countervailing benefits." *Id.* at 272–73, 114 S.Ct. 1483.

█ Determination of whether a statute, enacted after the events underlying a plaintiff's claims, is subject to a multi-step test, first articulated by the Supreme Court in *Landgraf.* First, a court must determine if "Congress has expressly prescribed the statute's proper reach." *Landgraf,* 511 U.S. at 264, 114 S.Ct. 1483. If Congress does so, the court's inquiry ends. However, if Congress does not expressly prescribe the statute's proper reach, the court must then determine whether the statute has an impermissible "retroactive effect." *Id.* In other words, the court must determine whether the statute, applied retroactively, would "impair the rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* If so, a presumption that the statute should not be applied retroactively controls. This presumption controls unless there is an expression of congressional intent to the contrary. *Id.* Accordingly, the Court applies the *Landgraf* test to the SOA.

### a. Statutory Language

Plaintiff suggests that Congress makes clear its intent to revive his extinguished claims via the SOA's express language, which makes the SOA applicable "to all proceedings ... commenced on or after the date of enactment of this Act." Pub.L. No. 107–204, § 804(a). There is nothing in this language that specifically addresses whether the new statute of limitations should apply to claims already barred by the existing statute of limitations at the time of enactment. *See Heritage,* 289 F.Supp.2d at 1148 ("[T]he Act does not address whether the revised statute of limitations should apply to claims barred by the existing statute of limitations at the time of enactment.").

Plaintiff cites one unpublished district court case supporting his proposition. *In re Sawtek Sec. Litig.,* No. 6:03–cv–294–Or1031DAB (M.D.Fla. Dec. 19, 2003). This case is unpersuasive. In *Sawtek,* the court merely noted that the "plain meaning" of the express language "clearly and unambiguously states" that if any proceeding were commenced after the SOA became law, the new SOA statute of limitations would apply in all cases.

This Court finds there is no express language in the SOA authorizing retroactive application of the statute of limitations provision of the SOA. However, Congress did not expressly preclude such retroactive application, either. Therefore, the Court cannot conclude that Congress has "expressly prescribed the statute's proper reach," *Landgraf,* 511 U.S. at 264, 114 S.Ct. 1483, and proceeds to the second step in the *Landgraf* analysis.

### b. Retroactive Effect of the SOA

█ The Court now turns its attention to the question of whether retroactive application of the SOA statute of limitations provision imposes an impermissible retroactive burden on Defendants. Based on controlling Ninth Circuit authority, the Court concludes that it does.

In *Chenault v. United States Postal Service,* 37 F.3d 535 (9th Cir.1994), the Ninth Circuit addressed the effect on previously time-barred claims of an amendment to the Civil Rights Act of 1964 that extended the statute of limitations. In *Chenault,* a postal worker brought suit against his employer for constructively discharging him from his position by failing to provide him with a reasonable accommodation for his handicap under the Rehabilitation Act of 1973. *Id.* at 536. The employee neglected to file a his failure-to-accommodate claim within thirty days of the final administrative decision, as required by the statute at

that time. *Id.* at 536–37. The district court ruled that his claim was time-barred. *Id.* at 536.

While his constructive discharge claim was pending, Congress extended from thirty to ninety days the time in which a plaintiff may file suit after a final administrative decision is rendered. *Id.* at 537. The employee argued that his failure-to-accommodate claim was revived under the new statute of limitations. *Id.* The Ninth Circuit held that to apply the new statute of limitations retroactively would "alter the substantive rights" of a party and "increase a party's liability," as the party would be "forced to defend an action that was previously time-barred." *Id.* at 537, 539. In holding that the new statute of limitations could not be applied retroactively, the court stated "a newly enacted statute that lengthens the applicable statute of limitations may not be applied retroactively to revive a plaintiff's claim that was otherwise barred under the old statutory scheme." *Id.* at 539.

The Supreme Court has indicated its approval of *Chenault's* holding in a case involving the retroactive application of an amendment to the False Claims Act ("FCA"). *Hughes Aircraft Co. v. United States,* 520 U.S. 939, 950–52, 117 S.Ct. 1871, 1878–79, 138 L.Ed.2d 135 (1997). The FCA permits suits by private parties on behalf of the United States against anyone who submits a false claim to the government. 31 U.S.C. § 3730(b). The provision at issue permitted *qui tam* actions to proceed based on information already in the government's possession. *Hughes Aircraft,* 520 U.S. at 945–46, 117 S.Ct. 1871. The parties agreed that if the amendment did not apply, the plaintiff's claims were barred. *Id.* at 945, 117 S.Ct. 1871. In comparing its case to *Chenault,* the Court stated "[t]he [newly-enacted] amendment would revive that action, subjecting [the defendants] to previously foreclosed ... litigation, much like extending a statute of limitations after the pre-existing period of limitations has expired impermissibly revives a moribund cause of action." *Id.* at 950, 117 S.Ct. 1871 (citing *Chenault,* 37 F.3d at 537).

The present action is not distinguishable. If the Court were to apply the SOA statute of limitations retroactively, Defendants, like the defendants in *Chenault,* would be required to defend a claim that was previously time-barred.

In arguing that the amendment has no impermissible retroactive effect, the Plaintiff makes an argument based on *Cabiri v. Assasie–Gyimah,* 921 F.Supp. 1189 (S.D.N.Y.1996). In *Cabiri,* the court considered the retroactivity of the Torture Victim Protection Act of 1991, Pub.L. No. 102–256, 106 Stat. 73 (1991). *Cabiri,* 921 F.Supp. at 1195. The Court acknowledged that the Act was silent as to the question of retroactive application, but nevertheless concluded that a cause of action under the Act could be applied to conduct that predated its enactment. *Id.* at 1195–96. In doing so, the court considered *Landgraf,* noting that the *Landgraf* Court was concerned with "[e]lementary considerations of fairness" that required courts to refrain from disrupting "settled expectations." *Id.* at 1195 (quoting *Landgraf,* 511 U.S. at 265, 114 S.Ct. 1483). The *Cabiri* court noted that the use of torture by a state official was universally condemned by "established norms of international law of human rights" and "the law of nations." *Id.* (internal citations omitted). The *Cabiri* defendant's settled expectations, therefore, would have been that conduct constituting torture violated international law. As such, the Torture Victim Act is more properly viewed as a mere jurisdictional statute that does not change the substantive rights of the defendant. Accordingly, it could be applied retroactively. *Landgraf,* 511 U.S.

at 274, 114 S.Ct. 1483 ("We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed . . . ."), *quoted in Cabiri,* 921 F.Supp. at 1195–96.

Here, the settled expectations of the parties at the effective date of the SOA was that the § 10(b) and § 20(a) claims were barred by the relevant statute of limitations. Unlike the statute at issue in *Cabiri,* the SOA is more than a mere jurisdictional statute that changes the forum in which a particular claim might be heard. Rather, the SOA confers additional substantive rights by extending the statute of limitations. Therefore, the SOA is subject to the presumption against retroactive application of new legislation, absent contrary congressional intent.

### c. Congressional Intent

Plaintiff argues that the legislative history of the SOA supports his position that the new statute of limitations should be applied to revive extinguished claims. Reference to legislative history is appropriate only when the text of the statute is ambiguous. *EEOC v. Luce, Forward, Hamilton & Scripps,* 345 F.3d 742, 753 (9th Cir.2003) (holding that courts are precluded from considering legislative history where the text of the statute is unambiguous). Here, the SOA provision extending the statute of limitations for securities fraud claims is ambiguous as to the issue of whether the limitations period was meant to apply to claims that were already time barred under the previous statute, so reference to legislative history is appropriate. However, reference to legislative history does little to clear up this matter.

Plaintiff points to a statement by Senator Daschle:

> By extending the time period during which victims can bring cases to recoup their losses, the [SOA] removes the re-

ward for those fraud artists who are especially gifted at concealing what they've done for lengthy periods of time. 148 Cong. Rec. S6436–02, S6347 (daily ed. July 9, 2002) (statement of Senator Daschle). This general statement merely recognizes the proposition that securities fraud claims are difficult to discover, and does not discuss whether the amendment to the statute of limitations was meant to revive extinguished claims.

Plaintiff also quotes a portion of the section-by-section analysis of the SOA, printed into the Congressional Record. 148 Cong. Rec. S7418–01 (daily ed. July 26, 2002). Referring to § 804 of the SOA, the analysis states:

> This section would set the statute of limitations in private securities fraud cases to the earlier of two years after the discovery of the facts constituting the violation or five years after such violation. The current statute of limitations for most private securities fraud cases is the earlier of three years from the date of the fraud or one year from the date of discovery. This provision states that it is not meant to create any new private cause of action, but only to govern all the already existing private causes of action under the various federal securities laws that have been held to support private causes of action. This provision is intended to lengthen any statute of limitations under federal securities law, and to shorten none. *The section, by its plain terms, applies to any and all cases filed after the effective date of the Act, regardless of when the underlying conduct occurred.*

*Id.* (emphasis added). This statement is ambiguous as well. It is capable of Plaintiff's interpretation, i.e., that the longer statute of limitations was meant to revive claims that had been extinguished by the previous statute of limitations. However,

the more likely meaning is that the new statute of limitations applies to all actions in which the complaint is filed after the effective date of the SOA, and is not limited to *conduct* occurring after the SOA's effective date. This construction is supported by the statement's reference to § 804's "plain terms." Those "plain terms" state that the SOA applies "to all proceedings ... *commenced* on or after the date of enactment of this Act." Pub.L. No. 107–204, § 804(a) (emphasis added).

To overcome the *Landgraf* presumption against retroactivity, Plaintiff has an uphill climb: he must show a expression of congressional intent to apply a statute retroactively. The legislative history cited by Plaintiff does not meet this standard.

Moreover, in order to determine congressional intent, the Court must, if such a construction is possible, read legislative enactments in such a manner as to give meaning to each provision. *In re Cervantes*, 219 F.3d 955, 961 (9th Cir.2000) ("[S]tatutes should not be construed in a manner which robs specific provisions of independent effects."). If the Court were to adopt the interpretation advanced by Plaintiff, i.e., that the extended statute of limitations was meant to be applied retroactively, the Court would be unable to reconcile this provision with § 804(c) of the SOA, which states that "[n]othing in this section shall create a new, private right of action." Pub.L. No. 107–204, § 804(c). *See In re Enterprise Mortgage Acceptance Co., LLC, Securities Litigation*, 295 F.Supp.2d 307, 312–13 (S.D.N.Y.2003) (reading § 804(a) (statute of limitations provision) in conjunction with § 804(c) (no new substantive rights provision) and concluding "it is not clear from the language of [§ ] 804 that it permits revival of previously time-barred claims."). Therefore,

reading § 804(a) and § 804(c) together, it is clear Congress did not intend to revive time-barred claims. To conclude otherwise would fail to give each provision meaning, contrary to the dictate of *In re Raymond Cervantes*.

The Court finds no congressional intent sufficient to overcome the *Landgraf* presumption against retroactivity.

### d. Ruling Based on *Landgraf* Retroactivity

Under *Landgraf*, the Court has determined that Congress failed to "expressly prescribe" the amendment's proper reach; however, the Court has also concluded that applying the amendment retroactively would have an impermissible "retroactive effect." Accordingly, the presumption that the amendment should not be applied retroactively applies and, because there is no clear expression of congressional intent to the contrary, this presumption controls. Accordingly, this Court holds that Plaintiff's §§ 10(b) and 20(a) claims are barred by the applicable statute of limitations.[5]

### B. Statute of Limitations—§ 20A

Section 20A imposes liability on inside traders for damages suffered by contemporaneous traders: "an insider who trades stock 'while in possession of material, non-public information' is liable to any person who traded contemporaneously with the insider." *In re Advanta Corp. Securities Litigation*, 180 F.3d 525, 541 (3d Cir.1999) (quoting 15 U.S.C. § 78t–1(a)). Section 20A was added to the 1934 Act in 1988 to "provide greater deterrence, detection and punishment of violations of insider trading." *Lampf*, 501 U.S. at 361, 111 S.Ct. 2773 (internal citations and quotation marks omitted). The Court noted that the

---

5. Because Plaintiff's § 20(a) cause of action is barred by the statute of limitations, the Court need not apply to § 20(a) the Court's subsequent analysis regarding § 20A, even though a violation of both sections requires a "predicate violation."

1988 addition "focuse[d] upon a specific problem, namely, the purchasing or selling [of] a security while in possession of material, nonpublic information." *Id.* (internal quotations marks and citations omitted).

Since its inception, § 20A has had a five-year statute of limitations. *Id.*; 15 U.S.C. § 78t–1(b)(4).

Claims under § 20A are derivative, and require proof of a separate underlying violation (a "predicate violation") of the 1934 Act. *Advanta,* 180 F.3d at 541. Plaintiff presents the Court with the novel question of whether § 20A survives when its predicate claim, here a violation of § 10(b), is barred by the statute of limitations. Plaintiff argues that his § 20A claim is actionable, notwithstanding the expiration of the statute of limitations with respect to the § 10(b) predicate claim, so long as he pleads and proves the elements of his predicate claim.

In cases in which § 20A claims have been dismissed for lack of a predicate claim, at least one element of the predicate claim had not been sufficiently pleaded. *See, e.g., In re VeriFone Securities Litigation,* 11 F.3d 865, 870, 872 (9th Cir.1993) (dismissing plaintiffs' § 20A claim because they failed to allege facts supporting the "materiality" element of the predicate claim); *Advanta,* 180 F.3d at 541 (dismissing plaintiffs' § 20A claim because they failed to allege facts supporting scienter); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697 (dismissing plaintiff's § 20A claim based on plaintiff's failure to allege any violation of the 1934 Act). Few courts have addressed the issue of whether a § 20A claim may proceed when the predicate claim is time barred. Neither of the two cases of which the Court is aware provide any real guidance to the Court in resolving this issue.

One district court case directly addressed the effect of a potentially complete, yet time-barred, § 10(b) claim on a § 20A claim. *See Sterlin v. Biomune Sys.,* 960 F.Supp. 1531, 1537 (D.Utah 1997). The court in *Sterlin* dismissed all of plaintiff's claims, including his § 20A claim as "barred by the one year statute of limitations." *Id.* However, the court neither engaged in any discussion about, nor gave any rationale for, its dismissal of the § 20A claims. *Id.* In the absence of a substantive rationale for dismissal of the § 20A claims, the Court does not find this authority persuasive.[6]

At oral argument, Plaintiff's counsel brought to the Court's attention a second case, one that supports his argument that the § 20A claim should proceed notwithstanding that the predicate claims are time barred. *See Hogan v. Piaseck,* No. 96 C 7399, 1997 WL 359984, 1997 U.S. Dist. LEXIS 9004 (N.D. Ill., June 18, 1997). The court in *Hogan* indicated its approval of the position that § 20A claims could proceed, notwithstanding the dismissal of the predicate claims on statute of limitations grounds, in light of the absence of legal authority to the contrary and the explicit five-year statute of limitations for § 20A claims. *Id.,* 1997 WL 359984 at *1, 1997 U.S. Dist. LEXIS 9004 at *2–3. Plaintiffs in *Hogan* had made this argument in connection with a motion for reconsideration of a dismissal order. *Id.,* 1997 WL 359984 at *1, 1997 U.S. Dist.

---

6. Upon appeal, the Tenth Circuit Court of Appeals merely "presumed" the lower court's dismissal of those claims was premised upon the expired statute of limitations of their predicate claims; the court had no reason to review this issue, as the plaintiff did not argue that the § 20A claim survived even if the predicate claim was time barred. *Sterlin v. Biomune Sys.,* 154 F.3d 1191, 1194 fn. 5 (10th Cir.1998). Nor did the lower court, upon remand, revisit the § 20A claim. *Sterlin v. Biomune Systems, Inc.,* 114 F.Supp.2d 1163 (D.Utah 2000).

LEXIS 9004 at *1. The court stated, in dicta, that although this argument "made sense legally," the argument did not change its earlier ruling, because the dismissal was not based on the statute of limitations. *Id.*, 1997 WL 359984 at *1–2, 1997 U.S. Dist. LEXIS 9004 at *2–4. Because this statement is mere dicta, *Hogan* is of little persuasive value. Nevertheless, for the reasons set forth below, the Court agrees with Plaintiff's position.

At the time of the conduct complained of in this action, the statute of limitations governing § 20A claims had been in effect for over a decade. Although Defendants may have had an expectation of repose after three years for any violation of § 10(b), they had ample notice that § 20A liability could be imposed based on claims filed up to five years after such violation. After all, although it was not until 2002 that the SOA extended the statute of limitations for § 10(b) and § 20(a), the five-year statute of limitations for § 20A had remained constant since § 20A's inception in 1988, eleven years before the subject trades.

Defendants point out that there was no uniform statute of limitations for § 10(b) claims at the time Congress enacted § 20A. *Lampf*, 501 U.S. at 354, 111 S.Ct. 2773. Nevertheless, had Congress intended that § 20A claims be time-barred whenever the predicate violation was time-barred, Congress could have so provided. It could have done so by either linking the statute of limitations of the § 20A claim to that governing the predicate violation, or by enacting a uniform statute of limitations for the 1934 Act.

Defendants also argued that *Jackson National Life Insurance Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703–04 (2d Cir.1994), supports their position. In *Jackson*, the Second Circuit held that § 20A must be based on a predicate violation of the 1934, rejecting Plaintiff's attempt to base a § 20A claim on a predicate violation of the 1933 Act. *Id.* at 703–04. The Second Circuit went on to note that, in any event, because the statute of limitations on the 1933 Act claim had expired, the § 20A claim would be barred as well. *Id.* at 704. The court viewed the three-year statute of limitations for the 1933 Act as the absolute limit for any claims under the 1933 Act, and that permitting a § 20A claim to proceed based on a predicate violation of the 1933 Act would violate that absolute limit. *Id.* The Court disagrees that the same conclusion is compelled when the § 20A claim is based on a predicate violation of the 1934 Act. The *Jackson* court itself recognized that "Congress added § 20A . . . to remedy the very specific problems inherent in insider trading cases[,]" and that "the [longer] five-year limitations period [of § 20A] recognizes the difficulties of ferreting out evidence sufficient to prosecute insider trading cases." *Id.* at 703 (internal citations and quotation marks omitted). The *Jackson* court rejected applying § 20A's longer statute of limitations to a 1933 Act claim, stating:

> Because the difficulties of pleading and proving scienter and the other elements of a Rule 10b–5 action do not similarly impede claims [under the 1933] Act, it would skew the legislative balance of interests to apply § 20A's five-year limitations period to the lower threshold of liability applicable to the initial distribution of securities under the [19]33 Act.

*Id.* at 704 (internal citations omitted). Unlike the claims presented in *Jackson*, the claims asserted in this action implicate the problems inherent in advancing insider trading claims. Accordingly, the Court finds *Jackson* unpersuasive on this issue.

The Court finds no reason to hold that Plaintiff's § 20A claim is barred simply because the predicate claim upon which it

is based is time barred. Although cases have dismissed a plaintiff's § 20A claim upon the dismissal of the predicate claim, the dismissal of the predicate claim in those cases was based on a defect in the predicate claim other than the statute of limitations. Unquestionably, Plaintiff must plead and prove the predicate claim in order to prevail on his § 20A claim, but the longer limitations period of § 20A permits him to attempt to do so. This is especially true in light of the stated congressional purpose in enacting § 20A in 1988: to address the uniquely difficult discovery problems inherent in insider trading cases, and to provide greater deterrence, detection, and punishment for insider trading violations. *Lampf,* 501 U.S. at 361, 111 S.Ct. 2773. The Court holds that Plaintiff's § 20A claim is not barred by the statute of limitations.

## C. Ruling on Statute of Limitations

As set forth above, Plaintiff may not maintain his claims based on § 10(b) or § 20(a). These claims are time barred. Nevertheless, Plaintiff may pursue his § 20A claim. To prevail on his § 20A claim, Plaintiff must plead and prove all the elements of a § 10(b) violation.

## IV. Pleading a § 20A Claim

### A. § 20A Elements

Section 20A imposes liability on insiders for damages suffered by persons who trade contemporaneously with the insider. 15 U.S.C. § 78t–1(a). "[A]n insider who trades stock 'while in possession of material, nonpublic information' is liable to any person who traded contemporaneously with the insider." *Advanta,* 180 F.3d at 541 (quoting 15 U.S.C. § 78t–1(a)). Accordingly, Plaintiff must plead that he

traded contemporaneously with Defendants.

Plaintiff has alleged such contemporaneous trading on nine specific dates in 1999 (the "subject trades"). (Compl. ¶ 1.)

Plaintiff must also plead all the elements of the predicate violation in order to maintain his § 20A claim. *In re VeriFone Securities Litigation,* 11 F.3d at 872 (9th Cir.1993); *Advanta,* 180 F.3d at 541. Plaintiff must therefore sufficiently plead a § 10(b) claim in order to maintain his § 20A claim. Therefore, the Court examines the pleading requirements for insider trading in violation of § 10(b) and Rule 10b–5.

### B. Insider Trading Elements

"[A] person violates Rule 10b–5 by buying or selling securities on the basis of material nonpublic information if: (1) he owes a fiduciary or similar duty to the other party to the transaction; (2) he is an insider of the corporation in whose shares he trades, and thus owes a fiduciary duty to the corporation's shareholders; or (3) he is a tippee who received his information from an insider of the corporation and knows, or should know, that the insider breached a fiduciary duty in disclosing the information to him." *S.E.C. v. Clark,* 915 F.2d 439, 443 (9th Cir.1990) (citing *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); *accord Dirks v. S.E.C.,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983)). In construing Rule 10b–5, the Supreme Court had held that when a corporate insider trades on the basis of material, nonpublic information, he or she employs a "deceptive device" as that term is used in Rule 10b–5.[7] *United States v. O'Hagan,* 521 U.S.

---

7. In relevant part, Rule 10b–5 provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud . . . ." 17 C.F.R. § 240.10b–5

642, 651–52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (citing *Chiarella,* 445 U.S. at 228, 100 S.Ct. 1108).

██ The Ninth Circuit has articulated the elements for an insider trading claim as the 1) intentional 2) misrepresentation or failure to disclose 3) a material fact 4) in connection with the purchase or sale of securities. *Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 769 F.2d 561, 563–64 (9th Cir.1985) (internal citations omitted). In keeping with the "disclose or abstain" rule [8] of insider information, these elements require that an insider have knowledge of material inside information and intentionally trade on that information without disclosing it to the public. *See id.* The Court examines each of these elements.

#### 1. Intent

The Supreme Court held that a violation of § 10(b) of the 1934 Act requires an allegation of scienter, i.e., the "intent to deceive, manipulate, or defraud," and that an allegation of negligence alone will not suffice. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976).

No discussion of scienter would be complete without reference to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 ("PSLRA"). Relevant to the current discussion, the PSLRA provides:

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2). Congress' intent in passing the PSLRA was to "deter opportunistic private plaintiffs from filing abusive securities fraud claims." *In re Silicon Graphics, Inc., Securities Litigation,* 183 F.3d 970, 973 (9th Cir.1999). Relevant to the present Motion, the PSLRA imposes heightened pleading standards [9] for scienter. 15 U.S.C. § 78u–4(b)(1)–(2).

In the lead case in the Ninth Circuit interpreting the PSLRA, the Ninth Circuit focused on allegations regarding reckless conduct that, the plaintiffs maintained, satisfied the "strong inference" standard. The Ninth Circuit held that under the PSLRA, a private securities plaintiff must plead scienter by describing "in great detail, facts that constitute strong circumstantial evidence of *deliberately* reckless or conscious misconduct." *Silicon Graphics,* 183 F.3d at 974 (emphasis added); 15 U.S.C. § 78u–4(b)(2). Although recklessness may satisfy the PSLRA's pleading standard, it may do so only when the recklessness approximates deliberate con-

---

**8.** The "disclose or abstain" rule states that a corporate insider has a traditional, affirmative duty to "abstain from trading in the shares of his corporation unless he has first disclosed all material nonpublic information known to him." *Chiarella,* 445 U.S. at 227, 100 S.Ct. at 1114. The duty arose from "(i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information

by trading without disclosure." *Id.* (internal citations omitted).

**9.** Although the circumstances constituting fraud must be generally pleaded with particularity, Fed.R.Civ.P. 9(b), the PSLRA imposes even more stringent pleading requirements on plaintiffs alleging securities fraud under the 1934 Act and Rule 10b–5, especially with respect to allegations of scienter. *See* 2 James Wm. Moore *et al.,* Moore's Federal Practice § 9.03[6][a][i] (3d ed.2004); 15 U.S.C. § 78u–4(b)(1)–(2).

duct: "[R]ecklessness ... satisfies [the] scienter [requirement only] to the extent that it reflects some degree of intentional or conscious misconduct." *Silicon Graphics,* 183 F.3d at 977.

Significantly, the Ninth Circuit explicitly rejected the notion that scienter may be pleaded merely by pleading motive and opportunity: "[M]otive to commit fraud and [an] opportunity to do so ... are not sufficient to establish a *strong* inference of [the] deliberate recklessness" necessary to plead scienter. *Id.* at 974. In the Ninth Circuit's view, its holding better reflects Congress' purpose in enacting the PSLRA: to end the practice of plaintiffs pleading "fraud by hindsight" in securities fraud complaints. *Id.* at 988.

Claims that fail to meet this heightened pleading standard are subject to dismissal: "[O]nly complaints with particularized facts giving rise to a *strong* inference of wrongdoing survive a motion to dismiss." *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002) (emphasis added); 15 U.S.C. § 78u–4(b)(3)(A). Because of the "strong" inference requirement, "the court must consider ... inferences unfavorable to plaintiffs." *Gompper,* 298 F.3d at 897.

In reaching its holding in *In re Silicon Graphics,* the Ninth explicitly rejected the looser pleading standard required by the Second Circuit, which requires plaintiffs to show only "simple recklessness or a motive to commit fraud and [an] opportunity to do so." *Silicon Graphics,* 183 F.3d at 974. The Ninth Circuit court distinguished between "mere recklessness," which suffices in the Second Circuit, and "deliberate recklessness," which, in the Ninth Circuit's view "come[s] closer to demonstrating [actual] intent, rather than mere motive and opportunity." *Id.* This holding, the Ninth Circuit reasoned, was more in keeping with the PSLRA's purpose to "deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part, by raising the pleading standards." *Id.* at 973. Congress intended to prevent those claims without a "strong inference" of deliberateness or intent. *Id.* at 974.

■ Plaintiff urges this Court to adopt the Second Circuit scienter standard, which finds an insider trading violation "occurs when a trade is conducted in 'knowing possession' of material nonpublic information." *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 143 (S.D.N.Y.1999) (quoting *U.S. v. Teicher,* 987 F.2d 112, 120 (2d Cir.1993)). The *Oxford* Court, in applying this "knowing possession" standard, stated that an insider trading violation "does not require ... that a causal connection exist between the knowing possession of the information and the trade, that is, it does not require that defendants 'use' the information when trading." *Oxford,* 187 F.R.D. at 143.

Defendants, on the other hand, argue that adoption of the Second Circuit standard is foreclosed by the Ninth Circuit case of *United States v. Smith,* 155 F.3d 1051, 1069 (9th Cir.1998). In *Smith,* the Ninth Circuit explicitly rejected the Second Circuit's "knowing possession" standard in favor of what it referred to as the "use" requirement. *Smith,* 155 F.3d at 1066–69. The court held that in order for a plaintiff to prove a Rule 10b–5 violation, he or she must "demonstrate that the suspected inside trader *actually used* material nonpublic information in consummating his transaction." *Smith,* 155 F.3d at 1069 (emphasis added).

However, *Smith* was a criminal case, and the Ninth Circuit explicitly declined to determine whether or not it would apply the same standard in a civil case. *Smith,* 155 F.3d at 1069 n. 27. The *Smith* court cited with approval the Eleventh Circuit case of *S.E.C. v. Adler,* 137 F.3d 1325, 1337–39 (11th Cir.1998), which held that although knowing possession of insider information is not a *per se* violation, when an

insider trades while in possession of material, nonpublic information, a strong inference arises that such information was used by the insider in trading. *Id.* Despite citing *Adler* with approval, however, the Ninth Circuit did not apply its holding in *Smith*. *Smith*, 155 F.3d at 1069. The court noted that to apply to the *Smith* case the evidentiary presumption set forth in *Adler* would be tantamount to shifting the burden of proof to the accused, which is impermissible in light of the constitutional protections for criminal defendants. *Smith*, 155 F.3d at 1069. The Ninth Circuit explicitly reserved the issue of whether the *Adler* presumption should be applied in a civil case. *Id.* at n. 27 ("We express no view as to whether or not an *Adler*-type presumption may be employed in *civil* enforcement proceedings under Rule 10b–5").

█ The Court will apply the presumptions of *Adler* in the present civil case. Although application of the heightened "actual use" standard in a criminal case may be necessary to protect the constitutional rights of the accused, the same is not true for a defendant in a civil case. Here, Plaintiff alleges that Defendants traded while in knowing possession of the Report. This allegation, especially when viewed in connection with Plaintiff's suspicious trading, detailed below, suffices to raise the strong inference of scienter required by the PSLRA.

Supporting the Court's holding that Plaintiff has sufficiently alleged scienter are Defendants' "unusual" or "suspicious" stock sales. Plaintiff correctly notes that "unusual" or "suspicious" insider stock sales may constitute circumstantial evi-dence of scienter. *Silicon Graphics*, 183 F.3d at 986. However, such sales are unusual or suspicious only when they are " 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.' " *Id.* (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989)). Therefore, the Court looks to whether Plaintiff has alleged that Defendants' trading was out of line with its prior trades. The relevant factors from which the court may infer an indicia of scienter are: (a) the amount and percentage of shares sold by insiders; (b) the timing of the sales; and (c) whether the sales were consistent with the insider's prior trading history. *Silicon Graphics*, 183 F.3d at 986.

### a. The Amount and Percentage of Shares Sold

Plaintiff has alleged that Defendants began selling one-million share blocks of Tracinda's DCX stock within one month of receiving the inside information, and that within four months after receiving the inside information, Tracinda had sold over 7.5 million shares. The net proceeds from the sale of these shares exceeded $661.6 million. This is significant evidence of scienter. A large number of shares were sold and the proceeds received exceeded half a billion dollars. Even to a multi-billion dollar corporation, this is a significant amount. The percentage of the shares sold represented 18% of Tracinda's holdings of DCX stock; contrary to Defendants' position, the Court finds this percentage significant as well, when considered along with the proceeds of those sales.[10] Plaintiff's allegations regarding

---

10. *Cf. In re Vantive Corporation Securities Litigation*, 283 F.3d 1079, 1092 (9th Cir.2002) (holding that sales of 38% of an insider's stock was not suspicious in light of an abnormally long sixteen-month class period during which the stock was sold); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir.2001) (noting, without discussion, that sales by the CEO and CFO of 10% and 17% of their stock was not suspicious); *In re Silicon Graphics*, 183 F.3d at 987–88 (finding sales of 46% of one insid-

the amount and percentage of the stock sold by Tracinda tend to support the element of scienter.

### b. The Timing of the Sales

Plaintiff alleges that Tracinda sold its first million share block of DCX stock less than one month after receiving the inside information, and that within four months, it had sold over 7.5 million of its shares. These sales were completed before the information regarding declining cash flow went public on July 29, 1999, at which time the stock declined in value 8.8%. Plaintiff alleges that by selling its stock before July 29, 1999, Tracinda saved over $120 million. (Compl. ¶ 35).

The parties argue over whether a trading bar was lifted only three weeks before Tracinda started selling its shares. Plaintiff contends Tracinda could have sold approximately four million of its shares notwithstanding the partial bar; Defendants maintain the bar precluded them and other "affiliates" of DCX from selling, collectively, greater than 1% of DCX's stock—a far more restrictive bar. The Court cannot resolve this issue at the pleadings stage. In any event, even assuming Defendants'

version is correct, the fortuitous timing of Tracinda's stock sales remain suspect.[11] Plaintiff's allegations regarding the timing of the stock sales by Tracinda tend to support the element of scienter.

### c. Prior Trading History

Plaintiff also asserts that Tracinda began to sell large blocks of DCX stock for the first time in June 1999. However, Defendants correctly point out that DCX stock had not long been in existence, because it was created by a merger that occurred in November 1998. Tracinda's trading history of the DCX stock predecessor, Chrysler stock, would be relevant to this inquiry. The Complaint alleges that Tracinda was at one time Chrysler's largest shareholder (owning 14% of its stock) and that Tracinda agreed in 1996 not to purchase additional shares of Chrysler in exchange for a seat on the Board of Directors. (Compl. ¶ 16.) Nevertheless, the Complaint does not make allegations regarding Tracinda's sales of Chrysler's stock. Such information would be relevant to Tracinda's prior trading history.[12]

---

er's stock was not significant in light of the fact that the sales constituted only 5% of the total stock sales with which the plaintiff was concerned and in light of the lack of data regarding past sales by the insider; and finding sales of 65% of a second insider's stock was not significant in light of the fact that he had acquired the stock in payment for his own former business and that trading restrictions on his stock had just been lifted).

If the Court were to consider only the percentage of Tracinda's DCX stock that was sold, less than 18%, these cases tend to support Defendants' position. However, the Court considers the amount *and* percentage of the shares sold, and notes that there is no indication that any of the above-cited cases involved amounts—in terms of shares sold or proceeds received—nearing the over 7.5 million shares or over $660 million in proceeds at issue in the current action.

**11.** It is clear that courts should consider how the three factors regarding suspicious trading may be interrelated. For instance, in *In re Silicon Graphics*, the Ninth Circuit considered the amount and percentage of stock sold in context, and that context included consideration of the timing of the sale. 183 F.3d at 987–88. There, the Court considered the fact that a restriction on trading had just been lifted as to stock acquired by an insider as consideration for the sale of his business. *Id.*

**12.** At oral argument, Plaintiff's counsel made general references to Tracinda's lack of sales of Chrysler stock in the months leading up to the DaimlerChrysler merger. Plaintiff may amend the Complaint to add these allegations.

For the reasons set forth above, Plaintiff has alleged facts that state with particularity facts gave rise to a strong inference of wrongdoing.

## 2. Materiality

### a. Reliance by Investors

■ In *Caravan*, the Ninth Circuit stated that the objective test for materiality was "whether there is a substantial likelihood that a reasonable investor would consider the fact important in making an investment decision." *Caravan*, 769 F.2d at 565 (internal citations and quotation marks omitted). The court continued by stating that materiality is a question of fact unless reasonable minds could not differ on the materiality of the withheld information. *Id.* (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

Plaintiff argues that information contained in the Report which Defendants had in their possession, showing a significant drop in "free cash flow" in 1999 when compared to 1998 as well as a projected " 'significant' free cash flow decline before net new business" and an "overall 'significant' free cash flow decline," was material. Defendants contend that Plaintiff selectively quoted material from the Report, and that Plaintiff's quoted information is not significant when taken in context of the Report in its entirety. However, materiality is not, as Defendant Aljian suggests, merely a question of whether the Report "paints a positive or negative picture of DaimlerChrysler"; but whether a reasonable investor would consider the information contained therein in making an investment decision.

The Ninth Circuit acknowledges that investors are concerned, perhaps above all, with the cash flows of the companies in which they invest. *United States v. Smith*, 155 F.3d 1051, 1064 n. 20 (9th Cir.1998). Therefore, it is substantially likely that a reasonable investor would consider the "significant" decline in "free cash flow" important, notwithstanding the rest of the information contained in the Report, in making an investment decision.

Moreover, as noted in *Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 935 (9th Cir.2003), when disclosure of information actually leads to a reduction in share value, it is likely that a reasonable investor would find that information material. Here, Plaintiff alleges that when a significant reduction in cash flow (2.1 billion Euro) was disclosed on July 29, 1999, DCX stock lost 8.8% of its value. Such actual reduction in share value lends support to the position that the information was material.

### b. Forward–Looking Statements

■ Defendants next argue that future projections are not "actual facts" and are therefore not "material" as a matter of law. Defendants cite a number of cases in support of its argument but, ultimately, a case not cited by Defendants resolves this issue.

In *United States v. Smith*, 155 F.3d 1051 (9th Cir.1998), *cert. denied*, 525 U.S. 1071, 119 S.Ct. 804, 142 L.Ed.2d 664 (1999), the Ninth Circuit addressed whether the materiality element of insider trading could be met with what it referred to as "soft" information, i.e., financial projections. *Id.* at 1064. The Ninth Circuit recognized that the difference between "soft" information and "hard" facts is not always clear. *Id.* at n. 22. The court explicitly rejected an argument that "soft" information was immaterial as a matter of law. *Id.* at 1065. Instead, the court held that the determination of materiality was a fact-intensive inquiry that must be made on a case-by-case basis. *Id.* at 1066. The court noted that with respect to projections, "materiality

'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'" *Id.* at 1065 (quoting *Basic, Inc. v. Levinson,* 485 U.S. 224, 238, 108 S.Ct. 978, 987, 99 L.Ed.2d 194 (1988)).

In the end, the Court is persuaded by Plaintiff's argument that because Daimler-Chrysler itself regarded the multi-billion dollar decline in free cash flow as "significant," it is likely that an investor in DCX stock would also find this information important. Certainly, at this stage of the proceedings, the Court cannot say that, as a matter of law, the information is not material.

For these reasons, the Court finds that Plaintiff has sufficiently pleaded the materiality element of insider trading.

### 3. Failure to Disclose

Plaintiff alleges that while in possession of material, nonpublic information, Defendants sold over 7.6 million shares of DCX. (Compl. ¶¶ 5–6). This meets the "failure to disclose" element of insider trading.

■ Defendants argue that no liability should be based on sales made after April 28, 1999,[13] the date of DaimerChrysler's Form 6–K filing. Defendants contend that the information from the Form K–6 filing was sufficient to supply both Plaintiff and the market with all the facts necessary to conclude that DCX's free cash flow was declining. However, the information released in Form 6–K reflected only the actual free cash flow loss of the previous quarter, and not the earlier projected loss, i.e., the information to which Defendants were privy while making the trades alleged herein. Therefore, it cannot be determined as a matter of law that because DaimlerChrysler released this Form 6–K on April 28, 1999, Defendants satisfied their duty to disclose for the five DCX stock trades made after that date.

### 4. Trading

Plaintiff alleges that Defendants traded a total of 7,642,241 shares on nine separate occasions from March 19, 1999 through June 11, 1999, while in possession of the material nonpublic information contained in the Report. This meets the fourth *Caravan* element which requires a purchase or sale of securities.

### V. Tipper/Tippee Liability

Only Aljian is alleged to be an insider. Therefore, Kerkorian and Tracinda are liable, if at all, under the "tippee" theory of liability.

■ "Not only are insiders forbidden by their fiduciary relationship from personally using undisclosed corporate information to their advantage, but they may not give such information to an outsider [i.e., the 'tipee'] for the same improper purpose of exploiting the information for their personal gain." *Dirks,* 463 U.S. at 659, 103 S.Ct. at 3264; *see* 15 U.S.C. § 78t(b) (making it unlawful to do indirectly "by means of any other person" any act made unlawful by the federal securities laws). The "tippee assumes a fiduciary duty to the shareholders of a corporation not to trade on material nonpublic information only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee, and the tippee knows or should know that there has been a breach." *Id.* at 660, 103 S.Ct. 3255.

Plaintiff alleges that Defendant Aljian is an insider of DCX by virtue of his position

---

**13.** Tracinda sold four million shares of DCX before this date; the remainder of the sales occurred after this date.

as a member of DCX's Shareholders Committee,[14] the corporation in whose shares he trades, and that he therefore owes a fiduciary duty to DCX's shareholders. Plaintiff also alleges that Defendants Kerkorian and Tracinda are "tippees" who received material nonpublic information from Aljian, and knew or should have known Aljian breached a fiduciary duty when he placed the Report in Tracinda's files.

Plaintiff has sufficiently alleged that Aljian was a tipper, and that Tracinda and Kerkorian were tippees who may be subject to liability.

## VI. Pleading Causation Under § 20A

Under the PSLRA, Plaintiff has the burden of "proving that the act or omission of the defendant ... caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). However, the PSLRA did not change traditional pleading rules with respect to causation. *Gebhardt v. ConAgra Foods, Inc.,* 335 F.3d 824, 830 n. 3 (8th Cir.2003); *Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910, 923 (N.D.Tex.1998). The Ninth Circuit set forth two components of the causation requirement under Rule 10b–5: Plaintiff must prove (1) that the violations in question caused Plaintiff to engage in his transaction ("transaction causation"), and (2) that the misrepresentations or omissions caused Plaintiff harm ("loss causation"). *McGonigle v. Combs,* 968 F.2d 810, 820 (9th Cir.1992) (internal citations and quotation marks omitted); *accord Gray v. First Winthrop Corp.,* 82 F.3d 877, 886 (9th Cir.1996).

Plaintiff alleges the DCX stock prices were artificially inflated as a result of Defendants trading on the material nonpublic information in their possession. Plaintiff alleges that he contemporaneously ac-

quired DCX stock, without the benefit of the information in the possession of Defendants, and was damaged thereby because he paid artificially inflated prices for the stock. Lending support to Plaintiff's position is his allegation that, upon news of DCX's free cash flow in the Form 6–K quarterly report made public on July 29, 1999, DCX shares closed down 8.8% from the previous trading day. Plaintiff alleges he would not have purchased the DCX stock if he was aware of this artificial inflation. Plaintiff's allegations satisfy the causation pleading requirement for insider trading.

## VII. Conclusion

Defendants' Motions to Dismiss (docket # 18, 20) are **hereby granted in part and denied in part.** The Court **dismisses with prejudice** the first and second causes of action, but denies the Motions to Dismiss as to the third cause of action.

---

14. Plaintiff alleges also that previous to Chrysler Corporation's merger with Daimler- Benz, AG, resulting in the formation of DCX, Aljian was a Director of Chrysler.